953 F.2d 587
 121 Lab.Cas. P 10,005, RICO Bus.Disp.Guide 7943,
14 Employee Benefits Cas. 2457
 Allan C. ALDRIDGE, Dennis W. Peterson and Henry A. Sieron,
Plaintiffs-Appellees, Cross-Appellants,
v.
LILY-TULIP, INC. SALARY RETIREMENT PLAN BENEFITS COMMITTEE
and Fort Howard Cup Corporation,
Defendants-Appellants, Cross-Appellees.
 No. 90-8686.
 United States Court of Appeals,
Eleventh Circuit.
 Feb. 12, 1992.
Rehearing and Rehearing En Banc
Denied April 9, 1992.
 
 Ted H. Clarkson, Augusta, Ga., Sanford M. Litvack, Dewey & Ballantine, Jack A. Gordon and Karen A. Estilo, New York City, for defendants-appellants, cross-appellees.
 David E. Hudson, Hull, Towill, Norman & Barrett, William F. Hammond, Augusta, Ga., for plaintiffs-appellees, cross-appellants.
 Appeals from the United States District Court for the Southern District of Georgia.
 Before FAY and BIRCH, Circuit Judges, and HOFFMAN*, Senior District Judge.
 BIRCH, Circuit Judge:
 
 
 1
 This is an interlocutory appeal from the United States District Court for the Southern District of Georgia in which pension plan participants ("participants") and the sponsoring company, Lily-Tulip, Inc. ("Lily"), contest the liability of a pension plan sponsor following termination of a plan. The plaintiff-appellants, a class of employees and former employees of the defendant company Lily, appeal the district court's dismissal of their ERISA claim for contingent, subsidized early retirement benefits which they were not paid upon the termination of the Lily pension plan. See Aldridge v. Lily-Tulip Inc., 741 F.Supp. 906, 920 (S.D.Ga.1990). For the reasons that follow, we find that the district court correctly dismissed the participants' ERISA claim and accordingly AFFIRM.
 
 
 2
 The district court also denied the defendant Lily's motion to dismiss the participants' RICO claim, and Lily cross-appeals. Id. at 914. Lily argues that the district court erred in finding that the RICO statute was constitutional as applied in this situation, that the RICO pattern requirement was met, that the RICO claim was not barred by the applicable statute of limitations, and that fraud was pled with sufficient particularity. Finding that the district court erred in concluding that the complaint alleged a pattern of racketeering activity, we REVERSE the trial court's denial of Lily's motion to dismiss the participants' RICO claim.
 
 I. FACTUAL AND PROCEDURAL BACKGROUND
 
 3
 Lily was created in September, 1981 by a group of private investors who acquired it as a cup manufacturing division of Owens-Illinois ("Owens"). On approximately September 17, 1981, Lily distributed a memorandum to the employees of the Lily-Tulip cup division of Owens, assuring the employees that there would be no change in retirement benefits upon Lily's acquisition of the division. Lily adopted a defined benefit plan called the Lily-Tulip, Inc. Salary Retirement Plan ("Plan"), which was identical to the plan that had been sponsored by Owens and gave employees credit under the new plan for their accumulated service with Owens.
 
 
 4
 A. Contingent Subsidized Early Retirement Benefits
 
 
 5
 The Plan provided for normal retirement benefits in the form of a monthly annuity, commencing at age sixty-five. Additionally, the Plan provided for subsidized and unsubsidized early retirement benefits. An unsubsidized early retirement would require the participant's monthly benefit to be reduced to its actuarial equivalent of the normal retirement benefits commencing at age sixty-five. The subsidized early retirement benefits provided that an employee could retire before age sixty-five and receive more than the actuarial equivalent of their normal retirement. Employees with thirty years of service and fifty-five years of age or ten years of service and sixty years of age were entitled to fully subsidized early retirement benefits.
 
 
 6
 In accordance with the plan's provisions, Lily amended the Plan on October 30, 1986 so as to effect its termination, as well as the cessation of future benefit accruals after December 31, 1986. R5-48 (Ex. 8); see also R5-48 (Ex. 7 at 74) (setting forth company's right to terminate). At the time of its termination, the Plan was underfunded. Lily distributed the Plan assets in order to satisfy those benefits guaranteed by the Pension Benefit Guaranty Corporation ("PBGC"). See ERISA Section 404, 29 U.S.C. § 1104 (1988).
 
 
 7
 The district court certified a class of Plan participants as plaintiffs in this ERISA dispute. The named plaintiffs were at varying degrees of satisfying the age and service requirements for subsidized early retirement benefits at the time of the Plan termination. Lily filed a motion to dismiss the ERISA claim, asserting that the law did not require it to fund the Plan in order to pay participants who would meet the conditions for early retirement benefits after the Plan terminated, if these benefits were unvested and contingent at the time of Plan termination. The district court granted Lily's motion and certified its resolution of this issue for immediate appeal to this court.
 
 B. Vacation Pay
 
 8
 Lily changed its vacation policy in 1982. In June, Lily reduced by twenty percent the amount of vacation time its employees would earn in the future. In November, Lily drafted a memorandum which stated in pertinent part as follows:
 
 
 9
 The new policy incorporates the following major changes:
 
 
 10
 1. The former vacation benefit is substantially restored with regard to service in relation to length of vacation entitlement, except that there is no partial vacation earned until the completion of a full year of service.
 
 
 11
 2. Vacation is earned during the current year rather than the prior year and must be taken in full within the year earned. There is no provision to carry over vacation periods earned in one year into the following year.
 
 
 12
 The policy as you will note is implemented January 1, 1983 and will supersede any and all prior policies at that time. Employees who have existing, untaken vacation entitlements under the former policy have until the end of the year to avail themselves of untaken vacation earned under the old policy.
 
 R7-68 (Ex. to McTague Aff.)
 
 13
 This memorandum was not received by Lily employees until December 1982.
 
 
 14
 Lily's new vacation policy allowed employees to take their vacation only in the year it was earned, essentially wiping off the slate any vacation earned in 1982. For example, an employee who had earned four weeks of vacation in 1980 could take that vacation in 1981. He could then take in 1982 the vacation time he had earned in 1981, while earning four weeks of vacation time in 1982. However, the vacation he took in 1983 could only be charged to that vacation earned in 1983, thus denying the employee the ability to take at any time the vacation earned in 1982.
 
 
 15
 At the time of the vacation policy change, Lily removed approximately $1.5 million in employees' accrued vacation liability from its record books and financial statements. The employees were not allowed to take their 1982 vacation time in the weeks remaining in the year after they were notified of the restriction. The employees believed that they would be compensated when they terminated employment or retired for the value of their accrued vacation which they had not been able to take. Certain executives at Lily complained to other executives that the memorandum announcing the change in vacation policy was unclear, and that the employees should be informed that Lily's policy of paying terminated employees for accrued vacation had also been changed. R7-68 (Cross and McTague Affs.). The participants claim that they were unaware that they would not get paid for the unused vacation until June 1983 when an employee retired and did not receive payment for his 1982 vacation. R3-22 (Aldridge Aff.).
 
 
 16
 The district court certified a class of plaintiffs consisting of persons seeking damages under federal RICO and state law for Lily's alleged improper deprivation of vacation benefits for the year 1982. The participants alleged that Lily's change in vacation policy and the manner in which it was communicated were predicate acts of intentional fraud. Lily moved to dismiss both RICO claims, and the district court denied Lily's motions. Although the district court concluded that the Plaintiffs stated a RICO claim, it certified the immediate appeal to this court of its determination of the pattern requirement and the pleading of fraud with particularity issues.
 
 II. DISCUSSION
 A. ERISA Claim
 
 17
 The participants claim that the district court erroneously dismissed their ERISA claim. In reviewing the district court's dismissal, we will read the facts alleged in the complaint in the light most favorable to participants. "A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). The participants' complaint asserts that they were improperly denied the right to satisfy conditions after plan termination in order to earn the right to subsidized early retirement benefits which were provided in the Plan.[1]
 
 
 18
 The Plan was amended and restated effective January 1, 1985 to comply with the Retirement Equity Act of 1984, Pub.L. No. 98-397, 98 Stat. 1426 (1984) ("REA"). The Omnibus Budget Reconciliation Act of 1986, Pub.L. No. 99-509, 100 Stat. 1874 (1986), enacted new ERISA Title IV provisions to govern single-employer plan terminations initiated after January 1, 1986 and before December 17, 1987. These provisions are called the Single-Employer Pension Plan Amendments Act of 1986, Pub.L. No. 99-272, 100 Stat. 237 (1986) ("SEPPAA"), and along with REA are applicable to the December 31, 1986 Plan termination. REA amended 26 U.S.C. § 411(d)(6) of the Internal Revenue Code and its twin ERISA section 204(g), 29 U.S.C. § 1054(g), to provide that subsidized early retirement benefits are protected from elimination by a plan amendment or termination for a participant who satisfies the preamendment conditions for the subsidy either before or after the amendment or termination.[2] The participants argue that this ERISA provision, along with identical language in Section 8.1 of the Plan, obligates Lily to fund the Plan in order to pay the participants subsidized early retirement benefits upon their post-termination satisfaction of the age and service requirements.
 
 
 19
 In its amicus curiae brief, the PBGC disagrees with the participants' position that ERISA obligates Lily to provide funding for the Plaintiffs' contingent, subsidized early retirement benefits. As we noted in a recent ERISA decision, "we owe great deference to the interpretations and regulations of the Pension Benefit Guaranty Corporation ... which [is an] administrative agenc[y] responsible for enforcing and interpreting ERISA." Blessitt, 848 F.2d at 1167.
 
 
 20
 Furthermore, we only must determine whether the agency's interpretation is reasonable. In making this determination, we "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding ... [A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."
 
 
 21
 Id. at 1168 (quoting Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 n. 11 and 844, 104 S.Ct. 2778, 2782 n. 11 and 2782, 81 L.Ed.2d 694 (1984).
 
 
 22
 All parties are in agreement that ERISA's Title IV distribution sections do not provide PBGC insurance for the type of contingent benefits which the participants seek in this case. See ERISA Section 4044, 29 U.S.C. 1344 (1988). The participants allege that the obligations imposed upon plan sponsors by ERISA Title I (particularly, section 204(g), 29 U.S.C. § 1054(g)) are not undercut by the lesser requirements of the PBGC insurance program incorporated into ERISA Title IV (including section 4044(a), 29 U.S.C. 1344(a)) by SEPPAA. This position is supported by language appearing in a recent Supreme Court opinion: "It is inconceivable that ... section [4044(a) ] was designed to modify the carefully crafted provisions of Title I," pertaining to employees' right to benefits. Mead Corp. v. Tilley, 490 U.S. 714, 723, 109 S.Ct. 2156, 2162, 104 L.Ed.2d 796 (1989). However, even if we follow the example of the Fourth Circuit in Mead, which on remand held that the plan in that case permitted a reversion of plan funds to the sponsoring company only after the payment of unreduced early retirement benefits, it will not affect our disposition of the present ERISA claim. See Tilley v. Mead Corp., 927 F.2d 756 (4th Cir.1991). In the instant case, the question is not whether and when plan funds may revert to the sponsor, but rather whether ERISA requires the sponsor to add funds to the plan upon termination.
 
 
 23
 According to the PBGC's reasonable interpretation of the ERISA sections applicable to this plan termination, the participants' ERISA claim fails on the issue of funding. The PBGC asserts that Lily was not required to add additional funds to the Plan upon termination in order to satisfy the participants' contingent, forfeitable rights to subsidized early retirement benefits. SEPPAA and ERISA contain clear instructions on this issue. In a plan terminated under SEPPAA, the contingent early retirement benefits, those which have not vested upon plan termination, fall into category six of ERISA section 4044(a)(6), 29 U.S.C. § 1344(a)(6). As the PBGC stated in its amicus brief, "the benefits included within Category 6 are protected, if at all, by section 411(d)(3) of the Code, 26 U.S.C. § 411(d)(3). As a condition of tax qualification under section 401(a) of the Code, 26 U.S.C. § 401(a), section 411(d)(3) of the Code requires plans to provide that 'the rights of all affected employees to benefits accrued to the date of ... termination ... to the extent funded ... are nonforfeitable.' 26 U.S.C. § 411(d)(3) (emphasis added)." PBGC Brief at 13-14. Section 8.2 of the Plan, consistent with section 411(d)(3), provided that the contingent early retirement benefits would be provided "to the extent funded."[3]
 
 
 24
 Although present law would prevent a plan sponsor from limiting its liability upon its own failure to fund, this restriction was imposed in 1987, and Congress explicitly provided that it would only apply to plan terminations initiated on or after October 16, 1987. Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100-203, 101 Stat. 1330 (1987) ("1987 Act"). Therefore, the participants' ERISA claim fails because their right to subsidized early retirement benefits was limited to the extent to which they were funded,[4] and in Lily's case, they were not funded at all.[5]
 
 
 25
 The participants argue that Lily is unjustly enriched if it obtains the service of its employees with an illusory promise of consideration in the form of subsidized early retirement benefits. It seems unfair that Lily can leave a promised benefit unfunded, effectively denying the very benefit which it has promised in return for the participants' service. As Congress did in 1987, we find these policy arguments persuasive. Nevertheless, this court lacks authority to require more of Lily than the governing law demands. Therefore, we find that the district court correctly dismissed the participants' ERISA claim.[6]
 
 B. RICO Claim
 
 26
 The participants allege that Lily committed RICO violations with regard to its change in vacation policy, commencing with the Tucker memo and followed by a five-year period in which Lily used the mails to alter corporate financial records as well as to conceal Lily's fraudulent taking from its employees. Lily challenges the district court's denial of its motion to dismiss the participants' RICO claim on the grounds that the applicable statute of limitations bars the claim, the participants did not adequately allege a pattern of racketeering activity, the participants failed to plead fraud with particularity, and that RICO is unconstitutional as applied in this case. In light of H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), we find that the district court should have dismissed the participants' RICO claim because the participants have failed to allege a pattern of racketeering pursuant to 18 U.S.C. § 1961(5) (1988).[7]
 
 
 27
 Congress provided that in order to assert a RICO claim a plaintiff must allege a "pattern of racketeering activity" which is defined as "at least two acts of racketeering activity." 18 U.S.C. § 1961(5). In 1985, the Supreme Court suggested that the lower courts focus on the concept of "continuity plus relationship" in developing standards for evaluating the existence of a "pattern of racketeering activity." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985). The Court offered further guidance on the "continuity plus relationship" pattern requirements in H.J. Inc.:
 
 
 28
 Continuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. It is, in either case, centrally a temporal concept--and particularly so in the RICO context, where what must be continuous, RICO's predicate acts of offenses, and the relationship these predicates must bear to one another, are distinct requirements.
 
 
 29
 492 U.S. at 241-42, 109 S.Ct. at 2902 (emphasis in original) (citations omitted).
 
 
 30
 The participants allege that Lily used the mails in June, November and December, 1982 to alter Lily's financial records and to distribute "memoranda to implement the defrauding of the plaintiffs' vacation benefits." Aldridge, 741 F.Supp. at 912 (quoting the participants' complaint). The participants further allege in their complaint that Lily "continued to use the mails at least through February, 1987, to misrepresent the status of the vacation benefits" in order to prevent the participants from suing Lily to recover these benefits. Id.
 
 
 31
 We must conclude on this record that Lily's alleged illegal activity was not a pattern of racketeering of the closed-ended type. We find that it was accomplished in too short a period of time, approximately six months, in order to qualify as a pattern of racketeering activity. The Tucker memo, announcing in relatively clear terms Lily's intent to deprive its employees of their 1982 vacation benefits,[8] along with the removal of $1.5 million in liability from Lily's books, effectuated Lily's purported scheme to deprive the employees of their vacation benefits. As the Court stated in H.J. Inc., "predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy the pattern requirement." 109 S.Ct. at 2901.
 
 
 32
 Addressing whether Lily's activity threatens repetition in the future, we find that the facts alleged by the participants do not describe a pattern of racketeering under the open-ended concept. Lily's scheme was to deprive its employees of their 1982 vacation benefits and, thereby, to remove from their books $1.5 million in corporate liability. There are no allegations which would allow us to conclude that Lily's act of taking their employees' vacation time and subsequent acts to conceal that wrongdoing was a scheme which "projects into the future with the threat of repetition." H.J. Inc., 492 U.S. at 241, 109 S.Ct. at 2902; see also Olive Can Co. v. Martin, 906 F.2d 1147, 1150-51 (7th Cir.1990) (holding that defendants' scheme to set up a sham corporation in order to divert funds from their original corporation and its creditors to the sham corporation to benefit defendants was close-ended activity over a short period of time, with a natural ending and no threat of ongoing activity which did not satisfy the pattern of racketeering activity requirement under RICO). Lily's acts after the initial taking were allegedly performed in order to conceal their wrongdoing; they did not threaten future harm or a repetition of their illegal acts, nor did they impart any new injury upon the employees. Therefore, we find that the district court erred in its denial of Lily's motion to dismiss the participants' RICO claim.
 
 III. CONCLUSION
 
 33
 For the reasons stated, we hold that the district court's dismissal of the participants' ERISA claim is AFFIRMED, and the district court's denial of Lily's motion to dismiss the participants' RICO claim is REVERSED.
 
 
 
 *
 Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation
 
 
 [1]
 The district court held that the participants' rights to subsidized early retirement benefits were not created by section 8.1 of the Lily-Tulip Inc. pension plan, which contained the same language as 29 U.S.C. § 1054(g) (1988), because those provisions treated early retirement benefits as accrued only for the purpose of an amendment to a plan as opposed to a termination. We hold that the district court clearly erred in interpreting section 8.1 and 29 U.S.C. § 1054(g) as not applying to plan terminations. The legislative history, Internal Revenue Rulings, and our recent case Blessitt v. Retirement Plan for Employees of Dixie Engine Co., 848 F.2d 1164 (11th Cir.1988) (en banc) clearly indicate that this provision applies to plan terminations. See PBGC Brief at 7-8. Although we disagree with the district court in as much as we deem these provisions applicable, we affirm the dismissal on the analysis that follows
 
 
 [2]
 ERISA provides that "a plan amendment which has the effect of eliminating ... a retirement type subsidy ... shall be treated as reducing accrued benefits." 29 U.S.C. 1054(g). The congressional purpose of protecting unvested, contingent, subsidized early retirement benefits is clearly evinced in the REA legislative history which provides that "a plan is not to be considered to have satisfied all of its liabilities ... until it has provided for the payment of contingent liabilities with respect to a participant who, after the date of the termination of a plan, meets the requirements for a subsidized benefit." S.Rep. No. 575, 98th Cong., 2d Sess. (1984), reprinted in 1984 U.S.C.C.A.N. 2547, 2577
 
 
 [3]
 Plan section 8.2(d)(8) states that "the Accrued Benefit of each affected Participant, to the extent funded, shall become fully vested as of the date of termination."
 
 
 [4]
 Participants cite Treas.Reg. § 1.411(d)-4, Q & A -6 (1988) which became effective January 30, 1986 as support for their proposition that the availability of § 411(d)(6) benefits cannot be conditioned on funding because the level of funding is in the discretion of the employer. This regulation states in relevant part that "the availability of section 411(d)(6) protected benefits in a plan may not be conditioned on a determination with respect to the level of the plan's funded status, because the amount of funding is within the discretion of the employer." Id. Despite this language, we are convinced by the legislative history of the Omnibus Budget Reconciliation Act of 1987 that Congress actually modified the law in order to require sponsors to fund contingent early retirement benefits upon plan terminations. If this was the state of the law prior to 1987, the changes effected by the 1987 Act would be superfluous and the mandate that the act not be applied retroactively would be nonsensical
 In explaining its reasons for the 1987 amendments to ERISA, the Senate Finance Committee stated that "[u]nder present law, plan participants may lose their right to pension benefits if a plan is terminated with assets less than termination liability because the employer is not fully liable for unfunded benefits and because the PBGC has no liability for benefits in excess of guaranteed benefits." Staff of Senate Comm. on Finance, 100th Cong., 1st Sess., Explanation of Provisions Approved by the Committee on December 3, 1987 for Inclusion in Leadership Deficit Reduction Amendment 189 (Comm. Print 1987). In passing the 1987 Act, Congress increased an employer's liability to plan participants--without regard to the level of plan assets--from "benefit commitments" to the full amount of "termination liability," i.e., fixed and contingent liabilities. Prior to the 1987 Act, the law allowed that "[a] plan may be terminated ... only if it has sufficient assets to pay all benefit commitments under the plan," but expressly did not require that a plan have sufficient assets to cover the full termination liability (including contingent liabilities). H.R.Conf.Rep. No. 495, 100th Cong., 1st Sess., pt. 1, at 879 (1987), reprinted in 1987 U.S.C.C.A.N. 2313-1625.
 
 
 [5]
 Hence, the question of whether or not these benefits are characterized as "accrued" is irrelevant to our determination of whether the district court properly granted Lily's motion to dismiss the ERISA claims
 
 
 [6]
 We reject the participants' argument that Lily's failure to provide plan assets for the contingent early retirement benefits was a violation of the exclusive benefit rule of ERISA section 403(c)(1), 29 U.S.C. § 1103(c)(1) (1988). The rule provides in relevant part that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purpose of providing benefits ... and defraying reasonable expenses of administering the plan." Id. The exclusive benefit rule can only be violated if there has been a removal of plan assets for the benefit of the plan sponsor or anyone other than the plan participants. See Holliday v. Xerox Corp., 732 F.2d 548, 551-52 (6th Cir.), cert. denied, 469 U.S. 917, 105 S.Ct. 294, 83 L.Ed.2d 229 (1984). That the participants' benefits were underfunded does not in itself mean that there was a removal of plan assets which inured to the benefit of the employer
 
 
 [7]
 Therefore, we find it unnecessary to consider Lily's challenge to the district court's other conclusions upholding the participants' RICO claim
 
 
 [8]
 The participants argue that they reasonably misunderstood the Tucker memo to mean that they would lose the opportunity to take their 1982 vacation time, but that they would be compensated for the value of that time upon termination or retirement. Even assuming that the participants reasonably misinterpreted the Tucker memo, they were indisputably informed of the scheme at least when the first employee retired in June 1983 and was refused compensation for his accrued vacation benefits. Hence, even accepting the participants' version of the facts, we still find that Lily's illegal activities were accomplished in too brief a period of time in order to qualify as a pattern of racketeering activity