## MEAD CORP. *v.* TILLEY ET AL.

No. 87–1868.   Argued February 22, 1989—Decided June 5, 1989

MARSHALL, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, WHITE, BLACKMUN, O'CONNOR, SCALIA, and KENNEDY, JJ., joined. STEVENS, J., filed a dissenting opinion, *post*, p. 727.

*Patrick F. McCartan* argued the cause for petitioner. With him on the briefs were *Charles J. Faruki, Richard H. Sayler, Judith Boyers Gee, Keith Edward Hope, Leon E. Irish,* and *Glen D. Nager.*

*Clifford L. Harrision* argued the cause for respondents. With him on the brief were *Daniel D. Hamrick, James C. Turk, Jr., R. Louis Harrison, Jr., Robert T. Wandrei,* and *Edwin C. Stone.* [*]

JUSTICE MARSHALL delivered the opinion of the Court.

Today we decide whether, upon termination of a defined benefit plan, § 4044(a) of the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 1025, as amended, 29 U. S. C. § 1344(a) (1982 ed. and Supp. V), requires a plan administrator to pay plan participants unreduced early retirement benefits provided under the plan before residual assets may revert to an employer.

---

[*]Briefs of *amici curiae* urging reversal were filed for the Pension Benefit Guaranty Corporation by *Gary M. Ford* and *Carol Connor Flowe;* for the American Academy of Actuaries by *Gary D. Simms;* for the American Paper Institute, Inc., by *Mark E. Brossman;* for the American Society of Pension Actuaries by *Chester J. Salkind;* for the Chamber of Commerce of the United States by *Robin S. Conrad;* and for the National Employee Benefits Institute by *Daniel B. Stone.*

Briefs of *amici curiae* urging affirmance were filed for the American Association of Retired Persons by *Christopher G. Mackaronis* and *Robert L. Liebross;* and for the American Federation of Labor and Congress of Industrial Organizations by *George B. Driesen* and *Laurence Gold.*

I

A

Congress enacted ERISA in 1974 in part to prevent plan terminations from depriving employees and their beneficiaries of anticipated benefits. 29 U. S. C. § 1001(a). Titles I and II provide requirements for plan participation, benefit accrual and vesting, and plan funding. Title III contains general administrative provisions. Title IV covers the termination of private pension plans, establishes a system of insurance for benefits provided by such plans, and creates a "body corporate" within the Department of Labor, the Pension Benefit Guaranty Corporation (PBGC), to administer that system. § 1302. The PBGC guarantees certain nonforfeitable benefits provided by qualified defined benefit pension plans. § 1322.[1]

A defined benefit plan is one which sets forth a fixed level of benefits. See § 1002(35). Contributions to a defined benefit plan are calculated on the basis of a number of actuarial assumptions about such things as employee turnover, mortality rates, compensation increases, and the rate of return on invested plan assets. See Stein, Raiders of the Corporate Pension Plan: The Reversion of Excess Plan Assets to the Employer, 5 Am. J. Tax Policy 117, 121–122, and n. 19 (1986).

When an employer voluntarily terminates a single-employer defined benefit plan, all accrued benefits automatically vest, notwithstanding the plan's particular vesting provisions. 26 U. S. C. § 411(d)(3). Title IV of ERISA requires that plan assets be distributed to participants in accordance with the six-tier allocation scheme set forth in § 4044(a), 29 U. S. C. § 1344(a). Section 4044(a) provides that plan administrators first distribute nonforfeitable benefits guaranteed by the

---

[1] For purposes of Title IV, a "nonforfeitable benefit" means "a benefit for which a participant has satisfied the conditions for entitlement under the plan or the requirements of this chapter." 29 U. S. C. § 1301(a)(8).

PBGC, 29 U. S. C. §§ 1344(a)(1)–(4) (1982 ed. and Supp. V);[2] then "all other nonforfeitable benefits under the plan," § 1344(a)(5); and finally "all other benefits under the plan," § 1344(a)(6).[3] If the plan assets are not sufficient to cover the benefits in categories 1–4, the PBGC will make up the difference. § 1361. The employer must then reimburse the PBGC for the unfunded benefit liabilities. § 1362. If funds remain after "all liabilities of the plan to participants and their beneficiaries have been satisfied," they may be recouped by the employer. § 1344(d)(1)(A). Similarly, the Internal Revenue Code (Code) conditions favorable tax treatment of the plan on satisfaction of "all liabilities with respect to employees and their beneficiaries under the [plan]" before plan assets may be diverted to others. 26 U. S. C. § 401(a)(2).

B

Respondents B. E. Tilley, William L. Crotts, Chrisley H. Reed, J. C. Weddle, and William D. Goode were employees

[2] By assigning the nonforfeitable benefits guaranteed by the PBGC to the first four priority categories, the allocation scheme "protect[s] against evasion of the . . . limits on the [PBGC's] insurance benefits by use of pension fund assets to first pay uninsured benefits." S. Rep. No. 93–383, p. 84 (1973).

[3] Section 4044(a) provides in relevant part:

"Allocation of assets

"(a) Order of priority of participants and beneficiaries

"In the case of the termination of a single-employer plan, the plan administrator shall allocate the assets of the plan (available to provide benefits) among the participants and beneficiaries of the plan in the following order:

"(1) First, to that portion of each individual's accured [sic] benefit which is derived from the participant's contributions to the plan which were not mandatory contributions.

"(2) Second, to that portion of each individual's accrued benefit which is derived from the participant's mandatory contributions.

"(3) Third, to [benefits that retired workers were receiving or could have received had the workers chosen to retire within the three years immediately prior to plan termination.

"(4) Fourth, to all other benefits guaranteed by the PBGC].

"(5) Fifth, to all other nonforfeitable benefits under the plan.

"(6) Sixth, to all other benefits under the plan."

of the Lynchburg Foundry Company (Foundry), formerly a wholly owned subsidiary of petitioner Mead Corporation (Mead).[4] The five were covered by the Mead Industrial Products Salaried Retirement Plan (Plan). The Plan was funded entirely by Mead's contributions.

As a single-employer defined benefit plan, the Plan set forth a fixed level of benefits for employees. Plan participants who completed 10 years of service attained a vested right to accrued benefits, that is, those benefits earned under the Plan. App. 30 (Plan, Art. I, § 13). These benefits included normal retirement benefits, payable at age 65 and calculated with reference to a participant's earnings and years of service. Id., at 37–41 (Plan, Arts. IV, § 1(b), V). At age 55, participants were eligible for early retirement benefits, calculated in the same manner as normal retirement benefits, but reduced by five percent for each year by which a participant's retirement preceded the normal retirement age. Id., at 37, 38–39 (Plan, Arts. IV, § 2, V, § 2(a)). A subsidized or unreduced early retirement benefit, i. e., a benefit equal to that payable at age 65, was available to participants who had 30 or more years of service and elected to retire after age 62. Id., at 39 (Plan, Art. V, § 2(b)). The Plan did not provide for any benefits payable solely upon plan termination.

In 1983, Mead sold Foundry and terminated the Plan.[5] Mead paid unreduced early retirement benefits only to those

---

[4] David H. Wall, another former employee of Mead, was also a party to this action, but he died while the action was pending in the District Court. This Court denied respondents' motion to substitute Richard H. Wall, executor of David H. Wall's estate, for David H. Wall. 488 U. S. 906 (1988).

[5] Mead sought approval of its proposed distribution of plan assets from the PBGC and the Internal Revenue Service (IRS), the two agencies responsible for enforcing ERISA. See 29 U. S. C. §§ 1341(a) and (b) (1982 ed., Supp. V). The PBGC replied that "[b]ased on the information [Mead] supplied . . . , the assets of this Plan will be sufficient as of [Mead's] proposed date of distribution to discharge when due all obligations of the Plan with respect to guaranteed benefits." App. to Pet. for Cert. 34a. The IRS issued a determination letter which stated that Mead's proposed plan termination would "not adversely affect its qualification for Federal tax

employees who had met both the age and years of service requirements. At the time Mead terminated the Plan, four respondents had over 30 years of credited service and a fifth had 28. None had reached age 62. Thus, each respondent received payment equal to the present value, determined as of the date of distribution, of the normal retirement benefit to which he would have been entitled had he retired at age 65.[6] Had Mead paid the present value of the unreduced early retirement benefits, each respondent would have received on average $9,000 more. App. to Brief for Respondents 1. After Mead finished distributing plan assets to plan participants, nearly $11 million remained in the Plan's fund. Mead recouped this money pursuant to Article XIII, § 4(f), of the Plan. App. 63.[7]

In 1984, respondents filed suit in the Circuit Court of the city of Radford, Virginia, alleging, *inter alia*, that the failure to pay the present value of the unreduced early retirement benefits violated ERISA, 29 U. S. C. §§ 1103(c), 1104(a)(1)(A), 1106(b), and 1344. Mead removed the case to the United States District Court for the Western District of Virginia. The District Court granted summary judgment in favor of Mead, concluding that "[t]he Plan's language, the legislative history, and the case law in the fourth circuit . . . clearly demonstrate that early retirement benefits are not 'accrued

---

purposes" as long as plan assets were not "returned to [Mead] before the plan's liabilities to all plan participants are satisfied." *Id.*, at 30a–31a.

[6] Each respondent elected to receive his benefits in a lump sum rather than as an annuity. Tilley received $87,108.74; Wall $65,360.80; Crotts $87,552.03; Reed $69,882.45; Weddle $50,800.35; and Goode $83,923.93.

[7] Section 4(f) of the Plan provides, in relevant part:

"Any surplus remaining in the Retirement Fund, due to actuarial error, after the satisfaction of all benefit rights or contingent rights accrued under the Plan . . . , and after distribution of any released reserves . . . shall, subject to the pertinent provisions of federal or state law, be returnable to [Mead]." App. 63.

benefits' under ERISA." Civ. Action No. 84–0751 (WD Va., Apr. 18, 1986). It therefore held that respondents were not entitled to additional sums under the Plan and that the assets remaining in the fund could revert to Mead pursuant to 29 U. S. C. § 1344(d)(1) and Article XIII, § 4(f), of the Plan.

The Court of Appeals for the Fourth Circuit reversed. 815 F. 2d 989 (1987). Adopting the reasoning of the Court of Appeals for the Second Circuit in *Amato* v. *Western Union Int'l, Inc.*, 773 F. 2d 1402 (1985), cert. dism'd, 474 U. S. 1113 (1986), the court concluded that before plan assets may revert to an employer, § 4044(a)(6) requires payment of early retirement benefits to plan participants "even if those benefits were not accrued at the time of termination." 815 F. 2d, at 991. That conclusion, the court stated, was dictated by the language of the statute, its legislative history, and agency interpretation. *Id.*, at 992. Finally, the court provided a formula for determining respondents' damages and specified that the money should be paid in a lump sum.

Because the question decided by the Court of Appeals for the Fourth Circuit is an important one over which the Courts of Appeals have differed,[8] we granted certiorari. 488 U. S. 815 (1988). We now reverse.

## II

Respondents concede that, at the time the Plan was terminated, they had not satisfied both the age and service requirements for unreduced early retirement benefits. Nevertheless, they claim that they are entitled to such benefits because, in their view, contingent early retirement benefits, even if unaccrued, are "benefits under the plan" under category 6, § 4044(a)(6), and therefore must be distributed before

---

[8] See *Ashenbaugh* v. *Crucible Inc., 1975 Salaried Retirement Plan*, 854 F. 2d 1516, 1529 (CA3 1988), cert. pending, No. 88–897; *Blessitt* v. *Retirement Plan for Employees of Dixie Engine Co.*, 848 F. 2d 1164, 1178–1179 (CA11 1988) (en banc); *Amato* v. *Western Union Int'l, Inc.*, 773 F. 2d 1402, 1415–1416 (CA2 1985), cert. dism'd, 474 U. S. 1113 (1986).

the employer can recoup any residual plan assets. Brief for Respondents 4.

We note preliminarily that the PBGC has flatly rejected respondents' argument. In the PBGC's view, § 4044(a) "does not create additional benefit entitlements. It merely provides for the orderly distribution of benefits already earned under the terms of a defined benefit plan or otherwise required at termination by other provisions of ERISA." Brief for PBGC as *Amicus Curiae* 9. The PBGC consistently has expressed this view in Opinion Letters addressing proposed plan terminations. See, *e. g.*, PBGC Opinion Letters Nos. 87–11 (Oct. 22, 1987); 86–5 (Mar. 6, 1986); 86–1 (Jan. 15, 1986). The Department of Labor and the IRS, the other agencies responsible for administering ERISA, agree that category 6 is limited to benefits created elsewhere. See PBGC, IRS, and Labor Department Guidelines on Asset Reversions, 11 BPR 724 (1984).

When we interpret a statute construed by the administering agency, we ask first "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; . . . [but] if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council*, 467 U. S. 837, 842–843 (1984); see also *INS* v. *Cardoza-Fonseca*, 480 U. S. 421, 446–448 (1987). Thus, we turn first to the language of the statute. See, *e. g.*, *Blum* v. *Stenson*, 465 U. S. 886, 896 (1984); *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U. S. 102, 108 (1980); *Nachman Corp.* v. *Pension Benefit Guaranty Corporation*, 446 U. S. 359, 373–374 (1980). Section 4044(a) in no way indicates an intent to confer a right upon plan participants to recover unaccrued benefits. On the contrary, the language of § 4044(a)(6)—"benefits *under the plan*"—can refer only to the allocation of benefits provided by the terms of the termi-

nated plan. The limited function of § 4044(a) as an allocation mechanism is made clear by its introductory language, which reads: "In the case of the termination of a single-employer plan, the plan administrator shall allocate the assets of the plan (available to provide benefits) among the participants and beneficiaries of the plan in the following order." Finally, any possible ambiguity is resolved against respondents by the title of § 4044(a)—"[a]llocation of assets." *FTC* v. *Mandel Bros., Inc.*, 359 U. S. 385, 388–389 (1959).

That § 4044(a) is a distribution mechanism and not a source for new entitlements also is illustrated by the structure of the statute. Title I of ERISA sets forth elaborate provisions to determine an employee's right to benefits. Those provisions describe in detail the accrual of benefits and the vesting of accrued benefits after service of a fixed number of years. Title IV, which contains § 4044(a), simply provides for insurance for benefits created elsewhere. It is inconceivable that this section was designed to modify the carefully crafted provisions of Title I.

To counter the plain language and clear structure of the statute, respondents rely heavily on legislative history. They contend that Congress' failure to include in category 6 the word "accrued," which appeared in a House version of the statute but did not survive the Conference Committee amendments, evinces an intent to require the provision of unaccrued as well as accrued benefits. We disagree. We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because "mute intermediate legislative maneuvers" are not reliable indicators of congressional intent. *Trailmobile Co.* v. *Whirls,* 331 U. S. 40, 61 (1947); see also *Drummond Coal Co.* v. *Watt,* 735 F. 2d 469, 474 (CA11 1984). There is simply nothing in the legislative history suggesting that Congress intended § 4044(a) to be a source of benefit entitlements rather than an allocation scheme. Neither the House nor the Senate bill provided for allocation of assets on plan termination to benefits

that were not created elsewhere.[9] Because the Conference Committee discussed fully the areas where ERISA altered prior law or where the final version of the statute differed from the predecessor bills,[10] it is reasonable to assume that had the Conference Committee intended to make § 4044(a) a source of benefit entitlements, it would have discussed the change in the Conference Report.

Respondents offer an alternative statutory argument. They suggest that because all accrued benefits vest upon plan

---

[9] The final allocation scheme in the House bill consisted of four categories: (1) employee contributions; (2) present value of nonforfeitable benefits in pay status or for which a participant qualified on the date of plan termination; (3) present value of other nonforfeitable benefits; and (4) present value of "accrued benefit[s]" not payable under higher priority categories. H. R. 2, 93d Cong., 2d Sess., §§ 112(b)(1)–(b)(4) (1974) (as passed by the House on February 28, 1974), reprinted in 3 Legislative History, Employee Retirement Income Security Act (Committee Print compiled for the Senate Committee on Labor) 3957–3958 (1976) (Legislative History). If any assets remained after the satisfaction of these liabilities, the House bill provided for allocation of assets first to investment earnings on employee contributions and then to benefits payable solely upon plan termination. Only then could any remaining assets be recouped. §§ 112(d)(1)–(d)(3).

Although the Senate amendment to H. R. 2 provided for a much simpler allocation scheme, it too was limited to benefits required by the plan or by another ERISA provision: (1) voluntary employee contributions; (2) mandatory employee contributions; (3) benefits in pay status for at least three years; and (4) all other benefits guaranteed by the PBGC. H. R. 2, 93d Cong., 2d Sess., § 444 (1974) (as passed by the Senate on March 4, 1974), reprinted in 3 Legislative History 3720–3721. The Conference Committee adopted an allocation scheme proposed by the administration which "combine[d] the best features of the House and Senate bills." Administration Recommendations to the House and Senate Conferees on H. R. 2 to Provide for Pension Reform 60 (April 1974), reprinted in 3 Legislative History 5107. See also H. R. Conf. Rep. No. 93–1280, p. 375 (1974), reprinted in 3 Legislative History 4277, 4642.

[10] See, e. g., H. R. Conf. Rep. No. 93–1280, pp. 268–282 (vesting), reprinted in 3 Legislative History 4535–4549; id., at 306–323 (prohibited transactions), reprinted in 3 Legislative History 4573–4590; id., at 355–356 (salary reduction plans), reprinted in 3 Legislative History 4622–4623.

termination pursuant to 26 U. S. C. § 411(d)(3), they are non-forfeitable benefits which fall within category 5 of the allocation scheme. Thus, they argue, if category 6 did not cover forfeitable benefits such as the contingent early retirement benefits at issue here, it would serve no purpose.

Respondents are mistaken. The PBGC has consistently maintained that, for purposes of its guarantee and of asset allocation under § 4044(a), the characterization of benefits as forfeitable or nonforfeitable depends upon their status before plan termination. See 29 CFR §§ 2613.6(b) and 2618.2 (1987) ("[B]enefits that become nonforfeitable solely as a result of the termination of a plan [are] considered forfeitable"). Soon after the enactment of ERISA, the PBGC stated that "priority category 6 will contain the value of accrued forfeitable benefits of a participant." 40 Fed. Reg. 51370 (1975). Thus, according to the PBGC, category 6 provides for the allocation of benefits that are forfeitable before plan termination as well as benefits provided under the plan for payment solely upon plan termination. See 29 CFR § 2618.16 (1987). Respondents have failed to persuade us that the PBGC's views are unreasonable. On the contrary, it is respondents' interpretation which cannot be squared with the statute. For if category 5 included benefits that were forfeitable before plan termination as well as those that were nonforfeitable, there would be no guarantee that nonforfeitable benefits would be paid before forfeitable benefits in cases where plan assets are insufficient to cover both. This result would contravene the clear directive of the allocation scheme to give priority to nonforfeitable benefits.

## III

We hold that § 4044(a)(6) does not create benefit entitlements but simply provides for the orderly distribution of plan assets required by the terms of a defined benefit plan or other provisions of ERISA. Because the Court of Appeals relied exclusively on § 4044(a)(6) as the grounds for respondents' en-

titlement to unreduced retirement benefits upon plan termination, we reverse that judgment. Respondents, however, offer two alternative grounds for concluding that ERISA requires payment of unreduced early retirement benefits before surplus assets revert to the employer: first, unreduced early retirement benefits may qualify as "accrued benefits" under ERISA; and, second, unreduced early retirement benefits may be "liabilities" within the meaning of § 4044(d)(1)(A), 29 U. S. C. § 1344(d)(1)(A). Because the Court of Appeals concluded that § 4044(a)(6) was a source of entitlement for unaccrued benefits, it did not reach these questions. We therefore remand for a determination whether respondents are entitled to damages on the basis of either of these alternative theories. In deciding these issues, the Court of Appeals should consider the views of the PBGC and the IRS. For a court to attempt to answer these questions without the views of the agencies responsible for enforcing ERISA, would be to "embar[k] upon a voyage without a compass." *Ford Motor Credit Co.* v. *Milhollin*, 444 U. S. 555, 568 (1980).[11]

---

[11] Although the parties and several *amici curiae* have discussed these alternative theories before this Court, the PBGC and the IRS have not. The PBGC filed a brief as *amicus curiae* in support of petitioner but specifically stated: "Like the Fourth Circuit, the PBGC expresses no view on the question, arising under Titles I and II of ERISA, whether early retirement benefits are accrued benefits." Brief for PBGC as *Amicus Curiae* 6, n. 3. The PBGC brief does not mention the § 4044(d)(1)(A) liabilities issue. The IRS did not file a brief before this Court. We are aware that the United States filed an *amicus curiae* brief on behalf of the IRS in *Amato* v. *Western Union Int'l, Inc.*, 773 F. 2d 1402 (CA2 1985), arguing that early retirement benefits are accrued benefits protected from elimination by plan amendment within the meaning of § 411(d)(6) of the Code. However, the parties and *amici curiae* disagree whether the IRS still holds this view. Compare Brief for Petitioner 32–33, and n. 27 ("Treasury Regulations issued in 1988 confirm the IRS's views that an early retirement subsidy is no part of the participant's accrued benefit"), with Brief for American Association of Retired Persons as *Amicus Curiae* 15 ("[T]he IRS has consistently interpreted the term accrued benefit to extend to the type of early retirement benefits at issue in this case"). Without the views of

Because § 4044(a)(6) is solely an allocation provision, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, dissenting.

Perhaps the Court is prudent to await the advice of the Solicitor General before deciding the principal question presented by this case. As presently advised, however, I am persuaded that the Court of Appeals reached the right conclusion, even though I agree with the Court that § 4044(a)(6) is not itself a source of retirement benefits.

In my opinion the early retirement benefits that respondents seek are contingent liabilities that under both ERISA and the Plan must be satisfied before plan assets revert to the employer. Section 4044(d) of ERISA provides that residual assets of a plan may revert to the employer only if three conditions are satisfied, including that "all liabilities of the plan to participants and their beneficiaries have been satisfied" and "the plan provides for such a distribution in these circumstances." 29 U. S. C. § 1344(d). Under the Plan, "[a]ny surplus remaining in the Retirement Fund, due to actuarial error, after the satisfaction of all benefit rights or contingent rights accrued under the Plan, . . . shall . . . be returnable to [Mead]." App. 63 (Plan, Art. XIII, § 4(f)). The term "liabilities," not defined in ERISA itself, is given meaning by a parallel provision in the Internal Revenue Code, 26 U. S. C. § 401(a)(2), which long has been interpreted to require a qualified plan to satisfy both contingent and fixed obligations before any of the plan's assets are diverted to any purpose other than the exclusive benefit of employees and

the agencies responsible for enforcing ERISA or an opinion by the Court of Appeals, we are reluctant to address these complicated and important issues pertaining to the private pensions of millions of workers.

their beneficiaries.[1] Thus, as I understand it, the question in this case is whether early retirement benefits are contingent liabilities under ERISA or the Plan. The answer, I believe, is yes.

Respondents have far more than an expectancy interest in early retirement benefits. Although the benefits may not be "accrued" in the ERISA sense, respondents have earned them under the Plan by serving over 30 years with Mead, and their right to payment is contingent only upon their election to retire after reaching age 62.[2] Cf. *Blessitt* v. *Retirement Plan for Employees of Dixie Engine Co.*, 848 F. 2d 1164, 1174, n. 22 (CA11 1988) ("[A]n employee is entitled to expect that early retirement provisions in a plan will not be deleted by amendment shortly before the employee qualifies"). Their position is similar to that of those employees whose rights to earned benefits prior to ERISA were frustrated by

---

[1] "The term 'liabilities' as used in section 401(a)(2) includes both fixed and contingent obligations to employees. For example, if 1,000 employees are covered by a trust forming part of a pension plan, 300 of whom have satisfied all the requirements for a monthly pension, while the remaining 700 employees have not yet completed the required period of service, contingent obligations to such 700 employees have nevertheless arisen which constitute 'liabilities' within the meaning of that term. It must be impossible for the employer (or other nonemployee) to recover any amounts other than such amounts as remain in the trust because of 'erroneous actuarial computations' after the satisfaction of all fixed and contingent obligations." Treas. Reg. § 1.401–2(b)(2), 26 CFR § 1.401–2(b)(2) (1988).

In explaining the statutory provisions of the Pension Protection Act, Pub. L. 100–203, Title IX, §§ 9302—9504, 101 Stat. 1330–333 to 1330–382, Congress in 1987 expressed a similar understanding that, under present law, a plan may be voluntarily terminated only "if it has sufficient assets to pay all benefit commitments under the plan" and that all benefits include "all fixed and contingent liabilities to plan participants and beneficiaries." H. R. Conf. Rep. No. 100–495, pp. 879, 884 (1987).

[2] The Plan provides:

"(b) If a participant with thirty (30) or more years of Credited Service elects to retire on or after he attains sixty-two (62) years of age, he shall be entitled to the Retirement Income provided under Section 1 of Article V without any reduction of benefits." App. 39 (Plan, Art. V, § 2(b)).

backloaded accrual schedules and abrupt plan terminations. Respondents' rights have been frustrated by the unilateral action of petitioner. It was precisely to prevent such pre-emptive actions depriving employees with long years of employment of their anticipated retirement benefits that Congress passed ERISA. See *Nachman Corp.* v. *Pension Benefit Guaranty Corporation*, 446 U. S. 359, 374–375 (1980). Petitioner was required both by IRS rulings and by prudent actuarial practice to accumulate the funds necessary to pay early retirement benefits.[3] It is reasonable to require it to take account of the contingent rights to those benefits of employees who have satisfied the years of service require-ment. I would construe contingent rights or liabilities to in-clude respondents' rights to early retirement benefits upon reaching age 62. Accordingly, I would affirm the judgment of the Court of Appeals.

---

[3] Under IRS rulings, if a plan has an early retirement benefit, the plan actuary is required to take the possibility of early retirement into account in deriving reasonable actuarial assumptions. See Rev. Rul. 78–331, 1978–2 Cum. Bull. 158; Internal Revenue Service Manual, Actuarial Guide-lines Handbook, reprinted in 1 CCH Pension Plan Guide ¶ 3565, Ch. 520 (1986). See also R. Osgood, Law of Pensions and Profit-Sharing § 3.4.4, p. 96 (1984); 4 S. Young, Pension and Profit-Sharing Plans § 18.06[2], pp. 18–121 (1988); 5 *id.*, § 22[B].03[8], p. 22B.48.