**PENSION BENEFIT GUARANTY CORPORATION, Plaintiff–Appellant,**

v.

**ARTRA GROUP, INCORPORATED, Defendant–Appellee.**

No. 91–3262.

United States Court of Appeals, Seventh Circuit.

Argued April 30, 1992.

Decided Aug. 11, 1992.

John H. Secaras, Sol. Gen. Department of Labor, Chicago, Ill., Carol Connor Flowe, John H. Falsey, Marc A. Tenenbaum (argued), Tracy Rickett, James Y. Callear, Pension Ben. Guar. Corp., Legal Dept., Washington, D.C., for plaintiff-appellant.

Marsha A. Tolchin, Adler, Kaplan & Begy, Chicago, Ill., Paul M. Heylman, Scott Robins (argued), Schmeltzer, Aptaker & Shepard, Washington, D.C., James E. Beckley, Beckley & Associates, Wheaton, Ill., for defendant-appellee.

Before CUDAHY and KANNE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

CUDAHY, Circuit Judge.

Back when it was called Dutch Boy, Artra Group, Inc. participated in a group pension plan for the benefit of its unionized Chicago employees. When Dutch Boy ceased operations in Chicago, it also stopped participating in the plan. The Pension Benefit Guaranty Corporation (PBGC) now guarantees the pension benefits of Artra's former employees. There is not enough money in the plan to pay those benefits, and the PBGC wants Artra to pay the difference.

The district court decided that Artra was not liable for the underfunding because its pension plan was not tax-qualified. 768 F.Supp. 248. We reverse and remand.

## I.

### A. *Background*

Title IV of the Employee Retirement Income Security Act of 1974 (ERISA) created the PBGC and a pension plan termination insurance program. The purpose of the program is to ensure that retirees will get the benefits they have earned, even if their employer has terminated the pension plan or is otherwise unwilling or unable to pay. *Mead Corp. v. Tilley*, 490 U.S. 714, 717–18, 109 S.Ct. 2156, 2159, 104 L.Ed.2d 796 (1989). The PBGC administers the program and funds it by charging insurance premiums and by collecting payments from employers who terminate underfunded plans. *Id.*

An employer's liability for a terminated, underfunded plan depends on the nature of the plan. If the plan is a multiple-employer plan, the employer is generally not liable for underfunding unless it is a "substantial employer" within the meaning of section 4001 of ERISA, 29 U.S.C. § 1301(a)(2), or has made contributions to the plan within the five years preceding the termination of the plan as a whole. 29 U.S.C. §§ 1363, 1364 (ERISA §§ 4063, 4064). If the pension plan is a single-employer plan, however, the employer is liable for any underfunding when the employer terminates the plan, so long as the plan is covered by ERISA. 29 U.S.C. § 1362 (ERISA § 4062). A single-employer plan is covered by ERISA if the plan is tax-qualified under section 401(a) of the Internal Revenue Code, 26 U.S.C. § 401(a), or determined to be tax-qualified by the Secretary of the Treasury. 29 U.S.C. § 1321(a)(2) (ERISA § 4021).

In 1978, Dutch Boy [1] agreed to become a participant in a group pension plan originally established by Local 1139 of the United Electrical, Radio and Machine Workers of America (the UE Plan). The terms of Dutch Boy's participation were set out in a Participation Agreement negotiated between Dutch Boy and the United Electrical, Radio and Machine Workers of America, Local 187. In 1980, Dutch Boy withdrew from the UE Plan because it closed its Chicago plant and no longer employed any members of the union. When Dutch Boy terminated, the PBGC became the guarantor of the accumulated retirement benefits owing to Dutch Boy's former employees.

Although Dutch Boy had made all the contributions that its Participation Agreement required, the PBGC eventually determined that the plan was underfunded and demanded that Dutch Boy pay $27,446,

---

**1.** From this point forward, we will refer to Artra Group as Dutch Boy. Dutch Boy was Artra's name at most of the times relevant to this litigation, and the documents refer to the company as Dutch Boy.

plus interest. Dutch Boy appealed to the PBGC Board of Appeals (the Board), which reduced the amount owing to $21,783 but otherwise upheld the demand.

### B. *The Decision of the PBGC Board of Appeals*

The Board's reasons for upholding the PBGC's determination of liability are important, and we present them at some length. First, Dutch Boy was not a substantial participant in the UE Plan, and the UE Plan did not terminate within five years of Dutch Boy's withdrawal. If the UE Plan was a multiple-employer plan, therefore, Dutch Boy is not liable. But the Board determined that the UE Plan was not a multiple-employer plan; rather, the PBGC decided that the UE Plan was an aggregate of single-employer plans.

According to the Board, the UE Plan was an aggregate of single-employer plans because the contributions of individual employers were not available to satisfy the benefit liabilities of other employers. PBGC Board of Appeals Opinion Letter, No. 90–172 at 2 (Dec. 6, 1990) (Board Decision); *see* 29 C.F.R. § 2615.2 (1991)[2] (definition of "plan"); *Saramar Aluminum Co. v. Pension Plan for Employees of Aluminum Industry & Associated Industries,* 782 F.2d 577, 582–83 (6th Cir.1986) (distinction between single and multiemployer plan); *PBGC v. Potash,* 7 E.B.C. 1292, 1293–94, 1986 WL 3809 (W.D.N.Y. 1986). The Board supported this conclusion by reference to the documents that governed Dutch Boy's participation in the plan, the accounting practices of the UE Plan and the manner in which other employers who withdrew from the UE Plan were treated. Nonetheless, the Board concluded that the terms of the documents alone were sufficient evidence of single-employer status. Board Decision at 4. Accordingly, we will focus on the documents.

According to the UE Plan Administrator, every participation agreement by which an employer joined the UE Plan contained a provision similar or identical to the following provision found in the Dutch Boy Participation Agreement:

> The Parties of this Participation Agreement shall have their funds separate and intact from that of any other group of participants under any other Participation Agreement in the Local 1139 UE Group Pension Fund and shall not have these funds commingled or pooled.

Participation Agreement ¶ 2. Further, the UE Plan Agreement and Declaration of Trust (the Trust Agreement), incorporated into the Dutch Boy Participation Agreement by reference, contains the following provisions:

> 6.01 The financing of benefits provided by the Plan is based on the continued contributions from the Participating Employers, as required in the collective bargaining agreements. If a Participating Employer should fail to make the required contributions, the Pension Plan cannot be continued for the Participants, the Employees of such Employer.
>
> 6.04 If ... the Participating Employer ceases to be obligated to continue contributions to the Fund, the assets then remaining in the Fund credited to the Participants of that Participating Employer shall be allocated, after providing for the expenses of the Plan, to the extent that they shall be sufficient for the purpose of paying retirement benefits based on Credited Service to the date of discontinuance of the Plan to the Pensioners and Participants in [the Plan's predetermined order of precedence].
>
> 9.01 ... (b) Nothing in this Agreement shall be construed as making any Union or Participating Employer liable for the payments required to be made by any other Participating Employer....

Trust Agreement §§ 6.01, 6.04, 9.01. According to the Board, these provisions establish that Dutch Boy's contributions were not available to satisfy the benefit liabilities of other employers. Board Decision at 3.

Having determined that Dutch Boy had established a single-employer pension plan

---

**2.** We cite to recent compilations of the federal regulations involved, but we should note that these regulations were in effect during the relevant periods.

(the Dutch Boy Plan), the Board went on to decide whether the plan was covered by ERISA. The Board noted that both before and after Dutch Boy joined the UE Plan, the IRS had issued determination letters that the UE Plan was tax-qualified under section 401(a) of the Internal Revenue Code. The Board concluded that these determination letters settled the tax-qualified status of the Dutch Boy Plan.

The PBGC then appealed to the District Court for the Northern District of Illinois to enforce its order. 29 U.S.C. § 1303(e). Dutch Boy counterclaimed, seeking relief from the Board's determination. 29 U.S.C. § 1303(f).

### C. *Decision of the District Court*

The district court determined that the Dutch Boy Plan, if such a plan existed, was not tax-qualified under section 401(a) of the Internal Revenue Code. The court did not, and did not need to, decide whether the UE Plan was a multiple-employer plan or an aggregate of single-employer plans: if the Dutch Boy Plan did not qualify for ERISA coverage even as a single-employer plan, then Dutch Boy was not liable for the underfunding, regardless.

The district court took two steps to its conclusion. First, the court observed that Treasury regulations establish that determination letters addressed to group plans do not act as determinations that individual components of a group plan deserve favorable tax treatment. Memorandum Opinion and Order at 6–9 (July 31, 1991) (Mem.Op.). Therefore, the Board's reliance on the IRS determination letters was misplaced. *Id.* at 8.

Second, the court concluded that the provisions of the Participation Agreement and the Trust Agreement did not satisfy the requirements of section 401(a) because they failed the "exclusive benefit rule." In other words, under the Dutch Boy Plan documents, it was not:

> impossible, at any time prior to the satisfaction of all liabilities with respect to employees and their beneficiaries under the trust, for any part of the corpus or income to be ... used for, or diverted to,

> purposes other than for the exclusive benefit of ... employees or their beneficiaries.

Mem.Op. at 9–10 (quoting 26 U.S.C. § 401(a)(2)). Although paragraph 2 of the Participation Agreement (quoted above) provided that Dutch Boy's contributions would be *"maintained"* separately from the contributions of other participating employers, *id.* at 11 (emphasis in original), the court concluded that paragraph 2 did not "definitely and affirmatively make it impossible" for the funds to be diverted or used for other purposes. *Id.* at 10–11 (quoting 26 C.F.R. § 1.401–2(a)(2)). Nothing in the UE Trust Agreement persuaded the court to change its conclusion.

## II.

■ Fortunately, this appeal takes longer to describe than to decide. Only one question is before us: Was the Dutch Boy Plan covered by ERISA? This question has two components. Was the Dutch Boy Plan "determined by the Secretary of the Treasury to be ... a plan described in section 401(a) of Title 26...."? 29 U.S.C. § 1321(a)(2). And if not, does the Dutch Boy Plan nevertheless meet section 401(a)'s requirements? These are questions of law, and our review is *de novo*. *Oddi v. Ayco Corp.*, 947 F.2d 257, 261 (7th Cir.1991).

■ We agree with the district court that the Secretary of the Treasury did not determine that the Dutch Boy Plan was tax-qualified. Instead, the Secretary determined that the UE Plan as a whole was tax-qualified. *See* Rev.Proc. 80–30, § 13.-01, 1980–1 C.B. 685, 695 (determination letter applies only to plan that requests letter); *see also* Rev.Proc. 80–29, § 4.01, 1980–1 C.B. 681, 682 (determination letter directed to master or prototype plan does not determine status of plans as adopted by particular employers). As it turns out, the PBGC does not argue that the Secretary would regard the determination letters as settling the tax status of the Dutch Boy Plan. Instead, the PBGC asks us to defer to its own interpretation of the determination letters. But we think that the PBGC's implicit concession settles the matter. The

statute allows the PBGC to rely on determinations by the Secretary of the Treasury. Since the Secretary has not made such a determination, as the PBGC admits, there is nothing for the PBGC to rely on. We do not think that the statute allows the PBGC to "interpret" a determination out of thin air.

Nonetheless, we believe that the Dutch Boy Plan was tax-qualified. First, the precise question before us should be delineated. There is no question that the UE Plan, as a whole, satisfies the exclusive benefit rule of section 401(a). In other words, the UE Plan Trust Agreement adequately provides that contributions to the UE Plan cannot be used for or diverted to purposes other than the exclusive benefit of the plan's beneficiaries. The IRS determination letters settle this question, even if they do not settle the status of the Dutch Boy Plan. The only question before us is whether Dutch Boy's contributions can be used for the benefit of the employees of other participating employers within the UE Plan.

■ We should also note that the PBGC Board of Appeals has already covered this ground. In deciding that Dutch Boy had created a single-employer plan, the Board determined that Dutch Boy's contributions were not available to satisfy the benefit liabilities of other employers. Further, although it appears that the Board would be willing to consider more than just the Plan documents in making such a decision, it is also clear that in this case it considered the provisions of the Dutch Boy Participation Agreement and the UE Plan Trust Agreement to be dispositive. We would defer to the Board's interpretation of the Plan documents but for three considerations. First, the Board's analysis was directed to another issue. Second, the PBGC has not asked us to defer to the Board's decision on this question. Third, although single-plan status and tax-qualified status appear to turn on the same factual question, it is not clear that the governing legal standards are the same: while the Board is willing to consider evidence of intent and course of conduct in determining single-plan status, the IRS requires the plan documents to "definitely and affirmatively make it impossible for the non-exempt diversion or use to occur." 26 C.F.R. § 1.401–2(a)(2) (1991). Accordingly, we consider the question without deferring to the PBGC.

■ The district court regarded paragraph two of the Dutch Boy Participation Agreement as a mere accounting provision. We agree that paragraph two mandates separate accounting, but the last phrase seems to be something more. The last phrase states that the UE Plan "shall not have [Dutch Boy's contributions] commingled or pooled." Since any disbursement of these funds to the benefit of non-Dutch Boy employees would involve commingling or pooling, the last phrase effectively prohibits diversion of the funds. The sections of the UE Plan Trust Agreement quoted in the Board's decision reinforce this understanding of paragraph two. Section 6.01 provides that if an employer stops participating in the UE Plan, its employees are entitled only to the funds remaining in the UE Plan contributed by their employer. Section 6.04 provides that only the employees of a terminating employer are entitled to the employer's contributions. Finally, section 9.01(b) ensures that participating employers will not be liable if other participants in the UE Plan do not pay contributions as required. In sum, these provisions of the Trust Agreement ensure that the contributions of each employer will go to its employees and to no one else.

■ On appeal, Artra argues for the first time that even if the current provisions of the Plan documents satisfy the exclusive benefit rule, nothing prevents those provisions from being amended. Artra claims that the lack of a no-amendment clause violates regulation 1.401–2(a)(2), which states that diversion or non-exempt use must not be possible "by power of revocation or amendment." 26 C.F.R. § 1.401–2(a)(2) (1991).

The PBGC argues that Artra has waived this argument by failing to raise it below, and we agree. *Resolution Trust Corp. v. Juergens*, 965 F.2d 149, 153 (7th Cir.1992). Our decision to treat this argument as

waived is reinforced by Artra's failure to cite any relevant case law or Revenue Rulings that interpret the regulation. The question presented by Artra's argument is tricky. Normally speaking, the parties to an agreement can always amend any provision of an agreement by mutual consent. Presumably, therefore, an agreement not to amend can itself be amended. This suggests that Artra's interpretation of the regulation makes no sense. Perhaps regulation 1.401–2(a)(2) merely specifies that the trust documents should not give the employer any unilateral power to revoke or amend the plan. *See, e.g., Walsh v. Great Atlantic & Pacific Tea Co.*, 726 F.2d 956, 959 (3d Cir.1983) (describing pension plan that provides for unilateral amendment by employer); *Lynch v. J.P. Stevens & Co.*, 758 F.Supp. 976, 983 (D.N.J.1991) (same). If so, the documents here satisfy the regulation, for Dutch Boy did not reserve the right to amend the terms of the Participation Agreement in any way. On the other hand, trust law is governed by different principles, and a no-amendment clause might be meaningful in this context. We are unwilling to attempt an authoritative interpretation of an important Treasury regulation when the issue is difficult and has not been adequately briefed. *In re James Wilson Associates*, 965 F.2d 160, 170 (7th Cir.1992) (refusing to decide "richly complex" issue not adequately developed); *id.* at 170 (Cudahy, J., concurring).

### III.

For the foregoing reasons, the decision of the district court is REVERSED. The cause is REMANDED for the court to determine whether the UE Plan was a multiple-employer plan or an aggregate of single-employer plans.

REVERSED AND REMANDED.