### Brenda (Cumberland) NOWELL, Plaintiff,

v.

### CENTRAL SERVICE ASSOCIATION and Massachusetts Mutual Life Insurance Company, Defendants.

#### No. 4:99CV180LN.

United States District Court, S.D. Mississippi, Eastern Division.

July 6, 2000.

---

Scott A. Johnson, Law Offices of Scott A. Johnson, Philadelphia, MS, for Plaintiff.

Stephen M. Corban, Mitchell, Voge, Beasley & Corban, Tupelo, MS, Ronald A. Yarbrough, Ott & Purdy, Steven H. Begley, John E. Hughes, III, Wells, Marble & Hurst, Jackson, MS, for Defendants.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

By memorandum opinion and order dated May 2, 2000, this court granted plaintiff Brenda Cumberland Nowell's motion to remand. Defendant Massachusetts Mutual Life Insurance Company (MassMutual), joined by Central Service Association (CSA), has moved the court to reconsider that ruling, and specifically, to reconsider the court's determination that the Central Service Association Employee Retirement Plan is a governmental plan and therefore exempt from the coverage of the Employment Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.*

A brief background is helpful to put defendants' motion in context. Following

the death of her late husband, plaintiff began to receive pension benefits under a plan, the Central Service Association Employee Retirement Plan (CSAERP, or Plan), provided by his employer, Philadelphia Utilities. That plan was administered by defendant CSA, and was funded by an annuity contract issued by MassMutual. After plaintiff remarried, she was advised that her monthly benefit payments would cease for a period of time and would thereafter resume, but at a substantially reduced rate. Plaintiff filed suit in state court, alleging that defendants wrongfully denied benefits which she claims are due her under the Plan. Defendants removed the case, claiming that plaintiff's claims are preempted by ERISA. Plaintiff moved to remand, asserting that the CSAERP is a governmental plan exempt from the coverage of ERISA. *See* 29 U.S.C. § 1003(b) ("The provisions of this subchapter shall not apply to any employee benefit plan if ... such a plan is a governmental plan...."). The court granted plaintiff's motion, first finding that, contrary to defendants' urging, Philadelphia Utilities is, in fact, an "agency or instrumentality" of the City of Philadelphia, a political subdivision of the State of Mississippi, within the meaning of ERISA's governmental plan exemption. *Nowell v. Central Servs. Ass'n,* No. 4:99CV180LN, at 12–13 (S.D.Miss. May 2, 2000). With regard to defendants' further contention that the participation in the CSAERP by private entities rendered the plan nongovernmental, despite *Philadelphia Utilities'* status as a governmental agency, the court held that since defendants had failed to demonstrate that the extent of private participation in the CSAERP was other than de minimis, they had thus failed to sustain their burden to demonstrate that the plan was other than governmental. *Id.* at 15. The court also noted that defendants had failed, even more fundamentally, to show that the plan met the definition of an employee benefit plan under ERISA in any event, as they had adduced no evidence to show that the plan was established by an "employer," as that term is defined by ERISA. *Id.* at 15–17 n. 8.

By their present motion, defendants do not ask the court to revisit the issue of whether Philadelphia Utilities is a governmental agency. Rather, they undertake by their motion and supporting exhibits to show that the CSAERP was established and maintained by CSA as an employer, and that private participation in the CSAERP is not de minimis, but rather is substantial. The court will address these issues in turn, starting with the extent of private participation.

The court's memorandum opinion and order reflects the court's conclusion that "the fact of participation in a plan by some private entities will not place the plan outside of ERISA's definition of a governmental plan where the extent of private participation is de minimis." *Id.* at 13. The court held, though, that defendants had failed to present any evidence that "there is private participation in the CSAERP that may be characterized as more than de minimis." *Id.* The court determined that "[i]n the absence of [such] proof[,] ... it [could not] be concluded that the plan at issue ... is governed by ERISA." *Id.* By their motion to reconsider, defendants seek to supply that missing proof, and have succeeded, for the evidence submitted by MassMutual in connection with the motion demonstrates a substantial level of participation in the CSAERP by private, nongovernmental employers. Specifically, MassMutual's evidence establishes that twenty-seven separate employer groups subscribe to the CSAERP, with a total of 1155 active employees who participate in the CSAERP. Of that number, 510 are employed by five private/nongovernmental employers, CSA, Southwest Tennessee Electric membership Corporation, Tippah County Electric Power Association, Tombigbee Electric Power Association and Western Kentucky Rural Electric Cooperative Corporation—which is to say, at least 44% of the active employees participating in the CSAERP are em-

ployees of private corporations, rather than governmental entities.[1] Plaintiff does not refute this proof. Clearly, then, the extent of private participation in the CSAERP is more than de minimis. That leaves for consideration, then, the issue of whether the CSAERP qualifies as an "employee benefit plan" under ERISA.

To come within the coverage of ERISA, a "plan" must be an "employee benefit plan" that is "established or maintained— (1) by any employer engaged in commerce or in any industry or activity affecting commerce; or (2) by any employee organization or organizations representing employers engaged in commerce or in any industry or activity affecting commerce; or (3) by both." 29 U.S.C. § 1003(a). One type of "employee benefit plan" that can come under ERISA is an employee pension benefit plan, which is defined by ERISA as "any plan, fund or program established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances, the plan, fund, or program provides retirement income to employees." 29 U.S.C. § 1002(2)(A). ERISA defines "employer" as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity." 29 U.S.C. § 1002(5).

This court previously noted that while it is apparent that the CSAERP qualifies as a "plan" to the extent that the plan, by its express terms, provides retirement income to employees, the court still was unable to conclude that the plan qualified as an "employee pension benefit plan" under ERISA given the absence of proof that the plan was established or maintained by an "employer." *Nowell, slip op.* at 16 n. 8 (citing

*Hall v. Maine Municipal Employees Health Trust,* 93 F.Supp.2d 73, 76 (D.Me. 2000) ("Before this Court can determine whether MMEHT fits within the governmental plan exception, it must first determine whether MMEHT fits within ERISA's definition of 'employee benefit plan' or more specifically, 'employee welfare benefit plan' ("EWBP").")).

■ Defendants take the position that CSA, as "a group or association of employers", established and maintains the CSAERP "indirectly in the interest of" its employer members and that the plan thus fits ERISA's definition of an employee pension benefit plan. The Fifth Circuit explained in *MDPhysicians & Associates, Inc. v. State Board of Insurance,* 957 F.2d 178 (5th Cir.), *cert. denied,* 506 U.S. 861, 113 S.Ct. 179, 121 L.Ed.2d 125 (1992)), that the determination of whether an "association of employers" exists under ERISA's definition of "employer" is made by reference to six criteria employed by the Department of Labor, which are: "1) the process by which the association was formed and the purposes for which it was formed; 2) the existence, if any, of pre-existing relationships among the employer/members; 3) whether employer/members were solicited; 4) who is entitled to participate and who actually participates in the association; 5) the powers, rights, and privileges of employer/members; and 6) whether employer/members actually control and direct the activities of the benefit plan." *Id.* at 186 n. 9 (citing DOL Op. No. 86–08a at 4 (Feb. 3, 1989); DOL Op. No. 84–11 at 3 (Feb. 22, 1984); DOL Op. No. 82–59 at 2 (Nov. 10, 1982)). "In addition to these six factors, courts have independently considered the 'common economic or representation interest' of the members and how much control the employer members have over the plan." *Hall,* 93

---

1. These facts are imparted via the supplemental affidavit of Scott Blassingame of CSA, together with affidavits from representatives of a number of the employers which participate in the CSAERP, namely, Southwest Ten-

nessee Electric Membership Corporation, Tippah County Electric Power Association, Tombigbee Electric Power Association and Western Kentucky Rural Electric Cooperative Corporation.

F.Supp.2d at 76 (courts evaluate these factors to determine whether plan was established by "a bona fide group or association of employers").

This court noted in its prior opinion that because defendants had adduced no proof "as to how, when or why CSA was formed or as to any of the listed factors," it could not discern whether CSAERP was an ERISA plan. Defendants have now supplied this proof. More to the point, in his supplemental affidavit, Scott Blassingame of CSA explains "how, when [and] why" CSA was formed.

Blassingame states that CSA was originally organized in 1937 by utility distributors from north Mississippi to perform utility customer billing and other services, and in January 1938, was incorporated under the laws of the State of Mississippi. Over the years since its inception, CSA has expanded its services to utilities distributors over a seven-state area within the Tennessee Valley Authority (TVA) region.

CSA is owned by utility distributors who contract to utilize its services. It consists of 140 shareholders and is managed by a board of directors, who are elected by its shareholders. There are fourteen directors, two from each of the seven districts within the TVA region, with one director from each district being the manager or superintendent of a private electric corporation and one from each district being the manager or superintendent of the electrical distribution system of a municipal corporation. All of CSA's members are in the same electric distribution industry.

In addition to customer billing, CSA provides to its members computerized information systems and various materials and supplies. CSA has also made available to its members certain employee benefit plans, funded by group life, health, disability and retirement insurance since through CSA, the member utilities are able to obtain better quality and lower cost employee benefit plans than would other-wise be available to an individual utility distributor in the marketplace.

CSA's Board of Directors established the CSAERP in 1947 to provide retirement benefits for its employees and the employees of utility distributors who are shareholders of CSA. CSA offers participation in the CSAERP to all present shareholders, prospective shareholders, and a limited number of employer groups who share a common utility or economic development interest with CSA or its member utilities. CSA does not offer participation in the CSAERP to the general public. Solicitation of new participants is directed primarily to utility distributors in the TVA region who are present or prospective members of CSA. The Board of Directors of CSA controls and directs the activities and operations of the CSAERP for the benefit of the participating employer groups.

■ The court readily concludes from these facts that CSA qualifies as an "employer" for the purposes of ERISA, having acted "indirectly in the interest of an employer" in relation to the CSAERP. It is also evident from these facts that CSA established and maintains the CSAERP. Plaintiff, though, seizing on a statement in Blassingame's affidavit that "[t]he benefits offered under the [CSAERP] vary, depending upon the benefits selected by each participating employer," argues that because participating employers have the discretion and ability to customize for its own employees an individual plan of insurance providing only those benefits which the particular employer deems appropriate, it follows that the CSAERP is appropriately viewed as having been "established and maintained" not by CSA, but by Philadelphia Utilities for the use and benefit of its own employees. Assuming that an employer may "establish" or "maintain" an employee benefit plan for the benefit of its employees by subscribing to a multiple employer plan, cf. *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir.1982) (en banc), the question here would seem to be

whether the CSAERP is an aggregate of single-employer plans, as contended by plaintiff, or a multiple employer plan, as defendants maintain.

■■■ The court in *Pension Benefits Guaranty Corporation v. Potash,* No. CIV–79–130B(E)) 1986 WL 3809, at *1 (W.D.N.Y. March 26, 1986), "set forth the appropriate test and the guidelines for determining whether a given plan is a single plan or an aggregate of separate ones," quoting extensively from an administrative decision by the Pension Benefits Guaranty Corporation (PBGC) on the subject,[2] as follows:

> " 'Plan' means a single plan (whether it be a single employer, multiemployer or multiple employer plan), as opposed to a number of plans, if, on an ongoing basis, all of the plan assets are available to pay benefits to employees who are covered by the plan and their beneficiaries.   ***

> \*      \*      \*      \*      \*      \*

> "A plan will not fail to be one plan solely because:

> (1) The plan has two or more distinct benefit structures that apply either to the same or different groups of participants;

> (2) The plan has several plan documents;

> (3) Several employers, whether or not 'affiliated' contribute to the plan;

> (4) The assets of the plan are invested in several trusts or annuity contracts;

> (5) The plan has purchased irrevocable commitments from an insurer to pay all or part of the participants' benefits; or

> (6) Separate accounting is maintained for purposes of costs allocation, but not

for purposes of providing benefits under the plan.

> "[T]he PBGC would review a multiple employer plan—a plan to which more than one employer makes contributions, which does not meet the full statutory definition of a multiemployer plan—as a single plan if, on an on-going basis, all plan assets are available to satisfy all participants' benefits, even though the plan contains restrictions on its obligations to participants in the event their employer withdraws from the plan.   In contrast, more than one plan exists if, on a going concern basis, a portion of the assets is not available to pay some of the benefits, irrespective of whether each plan has the same benefit structure or plan document or if all or part of the assets are involved in one trust.

> \*      \*      \*      \*      \*      \*

> "Our determination as to the nature of an entity—whether it is single plan or an aggregate of single plans—is based on its structure and how it actually operates on an ongoing basis.   We look to the documents governing the entity and to relevant evidence of how it has operated and continues to operate.   Such evidence may include the reasonable expectations and intent of the parties." January 17, 1984 decision at 2–4.

*Id.* at *1–2;  *see also Pension Benefit Guar. Corp. v. Artra Group, Inc.,* 972 F.2d 771, 773 (7th Cir.1992) (plan will be considered an aggregate of single employer plans, rather than a multiple employer plan, where the contributions of individual employers are not available to satisfy the benefit liabilities of other employers).

In the case at bar, the plan documents describe the Plan as a "single plan" that is a "multiple employer plan," and specifical-

**2.** Title IV of ERISA created the PBGC and a pension plan termination insurance program, the purpose of which is to ensure that retirees will get the benefits they have earned, even if their employer has terminated the pension plan or is otherwise unwilling or unable to pay. *Pension Benefit Guar. Corp. v. Artra Group, Inc.,* 972 F.2d 771, 772 (7th Cir.1992)

(citing *Mead Corp. v. Tilley,* 490 U.S. 714, 717–18, 109 S.Ct. 2156, 2159, 104 L.Ed.2d 796 (1989)).   "The PBGC administers the program and funds it by charging insurance premiums and by collecting payments from employers who terminate underfunded plans." *Id.*

ly recite that "[o]n an ongoing basis, all Contract values shall be available for payment of benefits to each Participant, joint annuitant or Beneficiary." It further provides that "[s]eparate accounting of Contract values may be maintained for purposes of cost allocation, but not for the purpose of providing benefits under the Plan, merging, consolidating or transferring Plan assets, or allocating assets upon termination of the Plan." There is nothing in the record to indicate that the Plan administered other than as recited therein, and accordingly, the court concludes that the plan is a multiple employer plan, established and maintained by CSA indirectly in the interest of the subscribing employers. Consequently, the court concludes that defendants' motion to reconsider should be granted and that the court's order remanding the case to state court vacated.

Accordingly, it is ordered that defendants' motion to reconsider is granted and it is thus ordered that the court's memorandum opinion granting plaintiff's motion to remand is vacated and that plaintiff's motion to remand is denied.