PENSION BENEFIT GUARANTY
CORPORATION Plaintiff

v.

REPUBLIC TECHNOLOGIES
INTERNATIONAL, LLC.,
et al. Defendants

No. 5:02 CV 01116.

United States District Court,
N.D. Ohio,
Eastern Division.

Sept. 30, 2003.

Lawrence J. Baer, Martin J. Bienenstock, Weil, Gotshal & Manges, LLP, New York, NY, Sean D. Malloy, Tyler L. Mathews, Shawn M. Riley, McDonald, Hopkins, Burke & Haber, Cleveland, OH, for Republic Technologies International, LLC., Defendant.

Heather N. Yanak, William G. Beyer, Susan E. Birenbaum, Pension Benefit Guaranty Corporation, Office of the General Counsel, Washington, DC, James J. Keightlcy, Pension Benefit Guaranty Corporation, Office of the General Counsel, Washington, DC, Ralph L. Landy, Washington, D.C., for Pension Benefit Guaranty Corporation, Plaintiff.

Jason H. Ehrenberg, Gary M. Ford, Lonie A. Hassel, Groom Law Group, Chartered, Washington, DC, David M. Fusco, Schwarzwald & McNair, Cleveland, OH, David R. Jury, Pittsburgh, PA, Paul

Whitehead, Pittsburgh, PA, for United Steelworkers of America, AFL–CIO,CLC, Defendant/Intervenor.

## MEMORANDUM OPINION AND ORDER

ECONOMUS, District Judge.

This matter is before the Court upon the following three motions: (1) the Motion of the United Steelworkers of America for Partial Summary Judgment Establishing the Date of Plan Termination (Dkt.# 52); (2) the Motion of Pension Benefit Guaranty Corporation for Summary Judgment (Dkt.# 54); and (3) Republic Technologies International, LLC's Motion for Interim Appointment of Trustee (Dkt.# 64).

### I. STATUTORY OVERVIEW

#### A. The Employee Retirement Income Security Act of 1974

In 1974, Congress enacted the Employee Retirement Income Security Act ("ERISA"), Pub.L. No. 93–406, 88 Stat. 829, (codified, *as amended,* at 29 U.S.C. §§ 1001–1461 (2003)), *inter alia,* "to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by termination of pension plans before sufficient funds [had] been accumulated in the plans." *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 720, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984) (citing *Nachman Corp. v. Pension Benefit Guaranty Corp.,* 446 U.S. 359, 361–62, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980)). *See also* 29 U.S.C. § 1001(a) (including among ERISA's congressional findings "that owing to the termination of plans before requisite funds have been accumulated, employees and their beneficiaries have been deprived of anticipated benefits"). As codified, ERISA has three principal subchapters. Subchapter I addresses the protection of employee pension benefit rights by establishing "rules for reporting and disclosure,

participation and vesting, funding of pension trust, fiduciary responsibility, and administration and enforcement." *A–T–O, Inc. v. Pension Benefit Guaranty Corp.,* 634 F.2d 1013, 1014 (6th Cir.1980); *see* 29 U.S.C. §§ 1001–1191. Subchapter II establishes the enforcement jurisdiction of various federal departments and agencies over the statute's provisions, as well as creates the joint pension task force. *See* 29 U.S.C. §§ 1201–1242. The final subchapter—Subchapter III—provides insurance coverage for pension benefits plans. *See* 29 U.S.C. §§ 1301–1461. As the instant action arises from Subchapter III's "comprehensive and reticulated" provisions, *Nachman,* 446 U.S. at 361, 100 S.Ct. 1723, a brief overview of the subchapter's structure and text will aid the further analysis of this case.

#### B. The Pension Benefit Guaranty Corporation

Subchapter III is the "key to the congressional plan," *Page v. Pension Benefit Guaranty Corp.,* 968 F.2d 1310, 1311 (D.C.Cir.1992) (Ginsburg, J.), designed "to guarantee that 'if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it,' " *R.A. Gray & Co.,* 467 U.S. at 720, 104 S.Ct. 2709 (quoting *Nachman,* 446 U.S. at 375, 100 S.Ct. 1723). Toward this end, Congress created the Pension Benefit Guaranty Corporation ("PBGC")—"a wholly-owned United States government corporation within the Department of Labor, modeled after the Federal Deposit Insurance Company." *Pension Benefit Guaranty Corp. v. LTV Corp.,* 496 U.S. 633, 636–37, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990) (citing Cong. Rec. 29950 (1974) (statement of Sen. Bentsen)); *see also* 31 U.S.C. § 9101(1), (3)(J) (listing PBGC among "wholly-owned Government corporation[s]"). Congress

vested PBGC with the authority to enforce and administer a mandatory Government insurance program that currently protects the pension benefits of over 44 million private-sector American workers who participate in 32,500 defined benefit pension plans.[1] *See generally* 29 U.S.C. § 1302; (Dkt. # 62, Supplemental Aff. of Wayne McKinnon ("McKinnon Supplemental Aff.") ¶ 2 and Ex. # 1 attached thereto, ("2002 Annual Report") at 5) (providing the most current data as to the extent of PBGC's operations).

*PBGC's Operations*

The Secretaries of the Treasury, Commerce, and Labor comprise PBGC's board of directors (the "Board"). *See* 29 U.S.C. § 1302(d).[2] The Board must administer PBGC's operations in accordance with three purposes:

(1) to encourage the continuation and maintenance of voluntary private pension plans for the benefit of their participants,

(2) to provide for the timely and uninterrupted payment of pension benefits to participants and beneficiaries under plans ..., and

(3) to maintain premiums established by the corporation under section 4006 [29 U.S.C.S. § 1306] at the lowest level consistent with carrying out its obligations under this title.[3]

29 U.S.C. § 1302(a)(1),(2),(3) (bracketed material in the original).

PBGC's operations include collecting insurance premiums from covered pension plans and providing benefits to participants in those plans if the plan terminates with insufficient assets to support its guaranteed benefits. *See* 29 U.S.C. §§ 1322, 1361 (establishing the types of guaranteed benefits and PBGC's mandate to pay guaranteed benefits upon termination, respec-

---

1. A defined benefit plan is one which sets forth a fixed level of benefits to be paid on a monthly basis to a participant in the plan upon the participant's retirement. *See* 29 U.S.C. § 1002(35). "Contributions to a defined benefit plan are calculated on the basis of a number of actuarial assumptions about such things as employee turnover, mortality rates, compensation increases, and the rate of return on invested plan assets." *Mead v. Tilley*, 490 U.S. 714, 717, 109 S.Ct. 2156, 104 L.Ed.2d 796 (1989) (citation omitted).

The term " 'participant' means any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit." *See* 29 U.S.C. § 1002(7).

2. Title 29 of the United States Code, section 1302(d) provides:

The board of directors of the corporation consists of the Secretary of the Treasury, the Secretary of Labor, and the Secretary of Commerce. Members of the board shall serve without compensation, but shall be reimbursed for travel, subsistence, and other necessary expenses incurred in the performance of their duties as members of the board. The Secretary of Labor is the chairman of the board of directors.

29 U.S.C. § 1302(d).

3. Throughout this Memorandum Opinion and Order, the Court frequently quotes directly from ERISA's provisions. The practice yields the potential for interpretative difficulty because, as evidenced in 29 U.S.C. § 1302(a)(3), ERISA repeatedly refers to "titles." The session law originally divided ERISA into four titles. Upon codification, the four titles of the session law were re-named "subchapters" to fit the scheme of the United States Code. Unless otherwise noted, reference to the official United States Code points out that "title" should read "subchapter." Nevertheless, it remains a common practice among the bench and bar to refer to ERISA's titles. *See, e.g.*, *LTV*, 496 U.S. at 637, 110 S.Ct. 2668 ("The PBGC administers and enforces Title IV of ERISA."). For ease of reference, this Memorandum Opinion and Order shall refer to the sections of ERISA according to the designations given upon codification in the United States Code.

tively). PBGC derives financing for its operations from four sources: (1) the insurance premiums set by Congress and paid by sponsors of defined benefit plans; (2) assets from terminated pensions plans trusteed by PBGC; (3) investment income; and (4) recoveries from the companies formerly responsible from trusteed plans. *See* (McKinnon Supplemental Aff. ¶ 2 and 2002 Annual Report at 39); *see also* (Dkt. # 55, Mem. of Points and Authorities in Supp. of Mot. of Pension Benefit Guaranty Corp. for Summ. J. ("Pl.'s Mem. in Supp."), Ex. # 3 attached thereto at 2).

*Plan Terminations*

PBGC's principal operations are to monitor and, under limited circumstances, initiate the termination of defined benefit plans where the plans have insufficient assets to satisfy their obligations to participants. In this situation, PBGC "becomes the trustee of the plan, taking over the plan's assets and liabilities." *LTV,* 496 U.S. at 637, 110 S.Ct. 2668. PBGC thereafter merges the remaining assets of the terminated plan with its own funds to "ensure payment of most of the remaining 'non-forfeitable benefits.' "[4] *See* 29 U.S.C. §§ 1301(a)(8), 1322(a) & (b); *LTV,* 496 U.S. at 638, 110 S.Ct. 2668. PBGC then pays benefits according to congressionally prescribed limits. *See* 29 U.S.C. § 1322(b)(3)(B).

Congress has entrusted PBGC with the authority to conduct both voluntary and involuntary terminations of defined benefit plans. *See* 29 U.S.C. §§ 1341–42. Voluntary terminations take two forms. First, a "standard termination" occurs when the employer has sufficient assets to pay all the benefit commitments of a terminated plan. *See* 29 U.S.C. § 1341(b); *see also LTV,* 496 U.S. at 639, 110 S.Ct. 2668. The second form of voluntary termination occurs when the company does not have sufficient funds to pay its obligations to the employees. *See* 29 U.S.C. § 1341(c). Under this latter form of termination, the employer must demonstrate financial distress to PBGC. *See* 29 U.S.C. § 1341(c).

Similarly, involuntary termination proceedings generally involve business entities that are experiencing severe financial difficulty. *See* 29 U.S.C. § 1342. Indeed, PBGC must initiate involuntary termination proceedings against a defined benefit plan when it determines that any of the following four factors are present:

(1) the plan has not met the minimum funding standard . . . [;]

(2) the plan will be unable to pay benefits when due[;]

(3) the reportable event described in section 4043(c)(7) [29 USCS 1343(c)(7) ] has occurred[;] or

(4) the possible long-run loss of the corporation with respect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated.

29 U.S.C. § 1342(a)(1),(2),(3),(4) (brackets in original).

Where PBGC seeks involuntary termination, the statute authorizes the plan administrator[5] and PBGC to select a mutual-

---

**4.** The statute defines a "nonforfeitable benefit" as follows:

[W]ith respect to a plan, a benefit for which a participant has satisfied the conditions for entitlement under the plan or the requirements of this Act (other than submission of a formal application, retirement, completion of a required waiting period, or death in the case of a benefit which returns all or a portion of a participant's accumulated mandatory employee contributions upon the participant's death), whether or not the benefit may subsequently be reduced or suspended by a plan amendment, an occurrence of any condition, or operation of this Act or the Internal Revenue Code of 1986 [26 USCS §§ 1, *et seq.*].

29 U.S.C. § 1301(a)(8) (bracketed material in the original).

**5.** The statute defines a plan administrator as: "(i) the person specifically so designated by the terms of the instrument under which the

ly acceptable date for plan termination ("DOPT"). *See* 29 U.S.C. § 1348(a)(3). If the parties are unable to reach an agreement, the statute vests the court with the authority to select an appropriate DOPT. *See* 29 U.S.C. § 1348(a)(4).

## II. FACTUAL HISTORY [6]

The instant action arises from the PBGC's initiation of involuntary termination proceedings against four defined benefit plans administered by the Defendant, Republic Technologies International, LLC ("RTI").

### A. RTI

During all times relevant, RTI was a leading domestic producer of special bar quality ("SBQ") steel products. *See* (Dkt. # 1, Compl. ¶ 6; Dkt. # 11, Answer ¶ 6; A.R.[7] 12, 185). RTI supplied SBQ steel products primarily to the automotive and industrial equipment industries. *See* (A.R.12, 185).

RTI is the surviving entity from several mergers and purchases of steel companies throughout the late 1980s and 1990s. RTI's emergence dates to 1989 when Republic Engineered Steels, Inc. ("RESI") was formed to operate the assets of the former Bar Division of LTV Steel Company, Inc. *See* (A.R.185). In 1998, RES Holding Corporation acquired RESI and merged RESI's assets with those of Bar-Tech, an entity operating the former Bar, Rod, and Wire Division of Bethlehem Steel Corporation and the assets of Bliss and

Laughlin Industries (hereinafter the "1998 merger"). *See* (A.R.12, 185). In 1999, RESI / BarTech joined with USS /Kobe Steel Company [8] to form RTI (hereinafter the "1999 merger"). RTI incurred approximately $850 million in secured debt as a result of the 1998 and 1999 mergers. Moreover, RTI became the plan administrator of four defined benefit plans: (1) the Republic Technologies International, LLC—USWA Defined Benefit Plan (the "RESI Plan"); (2) the Republic Technologies International, LLC Pension Plan for Union Eligible Employees at the Lorain Facility (the "Union Plan"); (3) the Republic Technologies International, LLC Pension Plan for Salaried Employees of the Former USS/KOBE Steel Company (the "Salaried Plan"); and (4) the Republic Technologies International, LLC Non-contributory Pension Plan for Hourly Paid Employees at Medina, Ohio (the "B & L Plan") (hereinafter collectively referred to as the "Plans"). *See* (Dkt. # 1, Compl. ¶ 7; Dkt. # 11, Answer ¶ 7). The Plans have a total of 6,237 participants. *See, e.g.,* (Dkt. # 1, Compl. ¶ 11; Dkt. # 11, Answer ¶ 11; A.R. at 16).

### B. Shut-down Benefits

In order to facilitate the 1998 and 1999 mergers, RTI negotiated new labor and pension agreements with the Intervenor–Defendant, United Steel Workers of America ("USWA" or "Union"), that included plant closures, as well as improved benefits to hourly employees. *See* (A.R.12). Significantly, RTI agreed to continue pro-

---

plan is operated; (ii) if an administrator is not so designated, the plan sponsor; or (iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary may by regulation prescribe." 29 U.S.C. § 1002(16)(A); *see also* 29 U.S.C. § 1301(a)(1).

**6.** The following facts are undisputed unless otherwise noted.

**7.** The Court's citation to "A.R." refers to the Administrative Record filed with the Court. *See* (Dkt.##29–38).

**8.** USS / Kobe Steel Company was a 50/50 joint venture formed in July, 1989 between subsidiaries of USX Corporation and Kobe Steel, Ltd.

viding "shut-down benefits" to participants of the Union Plan and agreed to enhance the RESI Plan by providing similar shut-down benefits. *See* (A.R.12, 1211–12, 1222, 1392–93, 1398–1400).

Specifically, RTI agreed to provide "Rule of 65" and "70/80" shut-down benefits that allowed otherwise eligible participants to receive an immediate unreduced early retirement benefit in the event of a permanent shut-down of RTI's facilities.[9] *See* (A.R.12, 1211–13, 1222, 1392–93, 1398–1400). Furthermore, the Union Plan and the RESI Plan provided all employees eligible for shut-down benefits with an additional payment of $400 per month payment at the time of RTI's permanent shut-down, until the employee is eligible for social security benefits. *See* (A.R.12, 1221–25, 1398–1400).

## C. PBGC's Response

PBGC recognized that RTI's highly-leveraged existence, coupled with the enhanced benefits provided under the RESI Plan and the Union Plan, placed PBGC's insurance fund at an increased risk. *See* (A.R.12). Consequently, PBGC negotiated agreements with RTI whereby RTI pledged to make payments in excess of the statutory minimum in return for PBGC's agreement to refrain from initiating termination proceedings. *See* (A.R.12, 352–63).

RTI thereafter experienced financial difficulty as a result of poor market conditions, a softening economy, and a high level of debt. *See* (A.R.13, 185–86). At RTI's request, PBGC repeatedly agreed to defer RTI's contribution payments. *See* (A.R.364–383). PBGC ultimately agreed to defer RTI's contributions until January 1, 2002. *See* (A.R.364–66).

## D. The Bankruptcy Proceedings

On April 2, 2001, RTI filed a voluntary petition pursuant to Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 1101–1174, in the United States Bankruptcy Court for the Northern District of Ohio. *See In re: Republic Technologies International, LLC, et al.,* 01–51117—01–51120; *see also* (Dkt. # 1, Compl. ¶ 8; Dkt. # 11, Answer ¶ 8).

*The Modified Labor Agreement*

During the bankruptcy proceedings, RTI and the Union entered into a Modified Labor Agreement, dated January 24, 2002 (the "MLA"), that, *inter alia,* (1) reduced employee wages fifteen percent; (2) eliminated 200 hourly positions; (3) modified certain health care benefits; and (4) modified certain guarantees of forty-hour work-weeks. *See* (A.R.13, 186,1138, 1919–2053). The MLA further provided that RTI and the Union would work in good faith to achieve a restructuring plan designed: (1) to assist RTI in securing a $250 million Emergency Steel Loan Guarantee from the federal government; (2) to assist RTI in obtaining PBGC and Internal Revenue Service ("IRS") approval on a further extension of contribution payments to the

---

9. Pursuant to the terms of the Union Plan and RESI Plan, an RTI employee is eligible to receive "70/80" shut-down benefits where: (1) the employee has not attained the age of 62 years and has at least 15 years of continuous service; (2) the employee has attained the age of 55 years and his/ her combined age and years of continuous service equal 70 or more **OR** the employee has a combined age and years of continuous service equal to 80 or more; and (3) RTI permanently has shut-down its facilities. *See* (A.R.12, 1211–12,

1392). The Union Plan and RESI Plan alternatively provide that a RTI employee is eligible to receive "Rule of 65" shut-down benefits where: (1) the employee has not attained the age of 55 years; (2) the employee has at least 20 years of continuous service; (3) the employee's combined age and years of continuous service equal at least 65 years but less than 80 years; and (4) RTI permanently has shut-down its facilities. *See* (A.R.16, 1212–13, 1393).

Plans; and (3) to provide RTI with authority to use equity and interest bearing debt to satisfy the claims of creditors (hereinafter collectively the " restructuring conditions"). *See* (A.R.13, 186,1138, 1919–2053). In the event RTI satisfied the restructuring conditions, the MLA required RTI to implement certain long-term provisions that afforded the Union with twenty-percent stock ownership in RTI and increased pension benefits and wages. *See* (A.R.13, 186, 1138, 1919–2053). Conversely, the MLA provided that in the event RTI failed to meet the restructuring conditions on or before May 31, 2002, RTI was to liquidate and sell its assets. *See* (A.R.13, 186, 1138, 1919–2053). In the event of liquidation, the Union agreed to adopt a successor labor agreement that minimized the costs to a potential purchaser. *See* (A.R.13, 186, 1138, 1919–2053).

*Newco, the Successor Labor Agreement and the Shut-down Agreement*

RTI failed to meet the restructuring conditions on or before May 31, 2002. Meanwhile, KPS Special Situations Fund, L.P. ("KPS") and Pegasus Partners II, L.P. ("Pegasus") (collectively "Newco"), declared their joint interest in purchasing RTI's assets. *See* (A.R. 13, 40). Additionally, Newco expressed its intention to hire 2,500 of RTI's 4,000 employees. *See* (A.R.13, 40). Accordingly, the Union and Newco submitted for the Bankruptcy Court's approval a Successor Labor Agreement ("SLA") that, *inter alia*, did not re-

quire Newco to assume the Plans. *See* (A.R.92–133, 1948–53). Additionally, the Union and RTI entered into a Letter Agreement, subject to the Bankruptcy Court's approval, whereby the Union agreed to withhold any objections to the proposed sale in consideration for RTI's agreement that any sale would constitute a "shut-down" pursuant to the RESI Plan and Union Plan (hereinafter the "Shutdown Agreement"). *See* (A.R.13, 143–152.) The Bankruptcy Court thereafter scheduled an auction of RTI's assets for July 9, 2002. *See* (A.R.19–27).

**E. PBGC's initiation of involuntary termination procedures**

PBGC immediately undertook an examination of the potential impact of the proposed sale on the Plans' participants, as well as the potential impact of the sale on its financial condition. On June 11, 2002, the Trustee Working Group ("TWG")[10] recommended to PBGC's Executive Director that PBGC initiate involuntary termination procedures against all of the Plans. *See* (A.R.3–338). The TWG further recommended that the Executive Director set an immediate DOPT in order to prevent the vesting of the RESI Plan and Union Plan shut-down benefit provisions. *See* (A.R. 18, 314–22 337–38).

The Executive Director concurred in the TWG's recommendation and issued a Notice of Determination ("NOD") pursuant to 29 U.S.C. § 1342(c) for each plan.[11] *See*

**10.** The TWG is composed of a Chairperson, who is a voting representative from the PBGC's Office of the Deputy Executive Director and Chief Operating Officer; voting representatives from the Office of the General Counsel, the Insurance Operations Department, the Corporate Policy and Research Department, and the Corporate Finance and Negotiations Department; and nonvoting representatives from the Financial Operations Department and the Communications and Public Affairs Department. The TWG reviews all pertinent information regarding

an involuntary termination and submits a written recommendation to PBGC's Executive Director. *See* (Dkt. # 55, Pl.'s Mem. in Supp., Ex. # 4 attached thereto).

**11.** Section 1342(c) provides that "[i]f the corporation [PBGC] is required under subsection (a) of this section to commence proceedings under this section with respect to a plan or, after issuing a notice under this section to a plan administrator, has determined that a plan should be terminated, it may upon notice to the plan administrator, apply to the appro-

(Dkt. #1, Compl. ¶¶ 18–27 & Ex. #1 attached thereto; Dkt. #11, Answer ¶¶ 18–27; A.R. 1–2, 314–22, 339–50). The NODs indicated: (1) that PBGC intended to terminate the Plans; (2) that PBGC would seek its appointment as statutory trustee of the Plans; and (3) that PBGC intended to have June 14, 2002 established as the DOPT. *See* (Dkt. #1, Compl. ¶¶ 18–27 & Ex. #1 attached thereto; Dkt. #11, Answer ¶¶ 18–27; A.R. 1–2, 314–22, 339–50).

### F. The proceedings before this Court

On June 14, 2002, PBGC filed a Complaint requesting that the Court: (1) adjudicate that the Plans are terminated pursuant to 29 U.S.C. § 1342(c); (2) appoint PBGC statutory trustee of the Plans; (3) order all parties having property, assets, or records, relevant to this matter to turn over such materials to the PBGC; and (4) establish June 14, 2002 as the DOPT pursuant to 29 U.S.C. § 1348(a)(4). *See* (Dkt. #1, Compl. at 12). The Court subsequently granted the Union's motion to intervene as a party-defendant. *See* (Dkt.# 20).

The instant motions ensued.

### G. The Bankruptcy Court's approval of the sale

On July 11, 2002, the Bankruptcy Court approved the sale of RTI's assets to Newco; consequently, it approved the SLA and the Shut-down Agreement. *See* (Dkt. #55, Pl.'s Mem. In Support, at Ex. 8 attached thereto). However, the Bankruptcy Court's order expressly provided that "the approval of these agreements is without prejudice to the rights of the [PBGC] under [ERISA] or in the pending

District Court litigation, *PBGC v. RTI*, Case No.5[:]02 CV 1116 (N.D.Ohio) (Economus, J.)." *See* (Dkt. #55, Pl.'s Mem. In Support, at Ex. 8 attached thereto at 12–13).

The asset sale closed on August 16, 2002. *See* (Dkt. #56, Mem. in Support of United Steelworkers of America's Motion for Partial Summ. J. Establishing the Date of Plan Termination ("Union's Mem. in Support") at App. A ¶ 2.) RTI declared a shut-down of its facilities effective August 16, 2002. *See* (Dkt. #55, Pl.'s Mem. In Support, at Ex. 9 attached thereto).

## II. STANDARD OF REVIEW

Summary judgment is proper where there lacks any genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In considering such a motion, the court must review all of the evidence in the record. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . .

---

priate United States district court for a decree." 29 U.S.C. § 1342(c).

PBGC published the NODs in seventeen newspapers, including USA Today. *See, e.g.,* (A.R.343–48). PBGC additionally mailed the NODs to the Union's local and international offices. *See* (A.R.339–342). It is undisputed that the Union received the NODs on June 14, 2002.

The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *accord Graham–Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 556–57 n. 7 (6th Cir.2000). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

"A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548 (quoting FED. R. CIV. P. 56(c)). The movant meets this burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Clayton v. Meijer, Inc.*, 281 F.3d 605, 609 (6th Cir.2002) (quoting *Celotex*, 477 U.S. at 324–25, 106 S.Ct. 2548). The non-movant then "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505.

"The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989) (quoting *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505). "A mere scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505.

## III.   LAW AND ANALYSIS

### A.   The termination of the Plans pursuant to 29 U.S.C. § 1342

Title 29 of the United States Code, § 1342(c) provides:

> If the corporation [PBGC] is required under subsection (a) of this section to commence proceedings under this section with respect to a plan or, after issuing a notice under this section to a plan administrator, has determined that a plan should be terminated, it may upon notice to the plan administrator, apply to the appropriate United States district court for a decree adjudicating that the plan must be terminated in order to protect the interests of the participants or to avoid any unreasonable deterioration of the financial condition of the plan or any unreasonable increase in the liability of the fund.

29 U.S.C. § 1342(c). Where, as here, PBGC invokes 29 U.S.C. § 1342(c), this Court previously has determined that it shall adopt the PBGC's decision to terminate a plan unless the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* (Dkt. # 47 at 8–9); *see also* 5 U.S.C. § 706(2)(A) (establishing that a court must uphold final agency action unless the agency's action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.").

*Termination of the Plans pursuant to 29 U.S.C. § 1342(a)(2)*

During the administrative process, PBGC determined that 29 U.S.C. § 1342(a)(2) compelled the involuntary termination of the Plans because each plan was unable to pay benefits when due. *See*

(Dkt. # 1, Compl. ¶¶ 29, 38, 47, 56; A.R. 1–3, 5, 314–32, 336–50).

PBGC specifically determined the following with respect to the RESI Plan: (1) the Plan had approximately $344 million in liabilities (including shut-down benefits); (2) the Plan had approximately $219 million in liabilities (excluding shut-down benefits); (3) the Plan had approximately $56 million in assets; therefore, (4) the Plan had unfunded benefit liabilities of approximately $287 million (with shut-down benefits) and $162 million (without shut-down benefits). *See* (A.R.7).

PBGC specifically determined the following with respect to the Union Plan: (1) the Plan had approximately $284 million in liabilities (including shut-down benefits); (2) the Plan had approximately $240 million in liabilities (excluding shut-down benefits); (3) the Plan had approximately $102 million in assets; therefore, (4) the Plan had unfunded benefit liabilities of approximately $181 million (with shut-down benefits) and approximately $137 million (without shut-down benefits). *See* (A.R.7).

With respect to the Salaried Plan, PBGC determined the following: (1) the Plan had approximately $10 million in liabilities; (2) the Plan had approximately $5 million in assets; therefore, (4) the Plan had unfunded benefit liabilities of approximately $ 5 million. *See* (A.R.7).

With respect to the B & L Plan, PBGC determined the following: (1) the Plan had approximately $1.8 million in liabilities; (2) the Plan had approximately $1.2 million in assets; therefore, (4) the Plan had unfunded benefit liabilities of approximately $ 600 hundred thousand. *See* (A.R.7).

Overall, PBGC determined that the Plans had unfunded benefit liabilities of approximately $475 million (including shut-down benefits) or $306 million (excluding shut-down benefits). *See* (A.R. 7). PBGC further determined that RTI would not be able to fund the Plans after the asset sale,

and that it was improbable that a potential purchaser would assume liability under the Plans. *See* (A.R.2–3, 17, 336–38). Accordingly, PBGC concluded that "termination of all four Plans was necessary in order to protect the interests of Plan participants because the Plans were underfunded, would be unable to pay benefits when due, and would be abandoned." *See* (A.R.337); *see also* (A.R.17, 316, 321,326, 331, 336).

*Termination of the Plans pursuant to 29 U.S.C. § 1342(a)(4)*

PBGC additionally determined that 29 U.S.C. § 1342(a)(4) required the involuntary termination of the RESI Plan and Union Plan because the "possible long-run loss of [PBGC] with respect to the plan[s] [could] reasonably be expected to increase unreasonably if the plan[s] [were] not terminated." *See* (A.R.3–5, 10, 12, 17, 316, 321, 337–38). In reaching the long-run loss determination, PBGC determined that its guaranty extended to approximately $188 million (including shut-down benefits) or approximately $122 million (excluding shut-down benefits) of RESI Plan benefits. *See* (A.R.7). PBGC further determined that approximately $132 million of the RESI Plan benefits (including shut-down benefits) or approximately $66 million (excluding shut-down benefits), were unfunded guaranteed benefits. *See* (A.R.7).

Similarly, PBGC determined that its guaranty extended to approximately $174 million (including shut-down benefits), or approximately $144 million of Union Plan benefits (excluding shut-down benefits). *See* (A.R.7). PBGC further determined that approximately $72 million (including shut-down benefits) or approximately $44 million (excluding shut-down benefits) of the Union Plan benefits were unfunded guaranteed benefits. *See* (A.R.7).

Consequently, PBGC concluded that the long-run loss posed by a combined $108 million (excluding shut-down benefits), or

$204 million (including shut-down benefits) in unfunded guaranteed benefits for the Union Plan and RESI Plan, threatened to unreasonably increase the liability of the PBGC insurance fund. *See* (A.R.4,5,18, 316, 326, 336–38).

*The 29 U.S.C. § 1342(c) criteria*

PBGC requests a decree from this Court terminating the Plans pursuant to 29 U.S.C. § 1342(c) in order to protect the interests of the plan participants. *See* (Dkt.# 1, Compl.¶¶ 31, 40, 49, 58). PBGC additionally requests a decree from this Court terminating the Union Plan and RESI Plan in order "to avoid an unreasonable increase in the liability of the PBGC insurance fund." *See* (Dkt.# 1, Compl. ¶¶ 31, 40.)

It is undisputed that PBGC acted within its authority when it initiated the involuntary termination procedures pursuant to 29 U.S.C. § 1342(a)(2). Furthermore, there lacks any dispute as to the propriety of the Court's termination of the Plans.

■ The Court, therefore, finds that the PBGC's determinations were neither arbitrary, capricious, nor an abuse of discretion. The Court additionally finds that PBGC acted in accordance with all applicable laws in reaching its termination decision pursuant to 29 U.S.C. § 1342(c).

Consequently, the Court shall defer to the PBGC's determinations that the RESI Plan, the Union Plan, the Salaried Plan and the B & L Plan must be terminated in order to protect the interests of the Plans' participants. The Court further shall defer to the PBGC's determinations that the RESI Plan and the Union Plan must be terminated in order to prevent any unreasonable increase in the liability of the PBGC insurance fund.

Accordingly, the Court hereby orders that the RESI Plan, the Union Plan, the Salaried Plan and the B & L Plan are TERMINATED pursuant to 29 U.S.C. § 1342(c).

### B. The appointment of PBGC as statutory trustee of the Plans

Title 29 of the United States Code, § 1342(c) provides that

Upon granting a decree for which the corporation or trustee has applied under this subsection the court shall authorize the trustee appointed under subsection (b) (or appoint a trustee if one has not been appointed under such subsection and authorize him) to terminate the plan in accordance with the provisions of this subtitle [29 USCS §§ 1341 *et seq.*].

29 U.S.C. § 1342(c).

PBGC requests that the Court appoint it as statutory trustee pursuant to 29 U.S.C. § 1342(c). *See* (Dkt.# 1, Compl.¶¶ 32, 36, 41, 45, 50, 54, 59, 63). The Defendants do not oppose this request.

Accordingly, the Court hereby orders that the PBGC is APPOINTED statutory trustee of the RESI Plan, the Union Plan, the Salaried Plan and the B & L Plan pursuant to 29 U.S.C. § 1342(c). PBGC shall have all powers vested in the statutory trustee as provided in 29 U.S.C. § 1342(d) and all other applicable provisions of ERISA. In addition, PBGC is authorized to terminate the plan in accordance with the mandate of 29 U.S.C. § 1342(c).

### C. The appropriate date of plan termination pursuant to 29 U.S.C. § 1348(a)(4)

*The evolving judicial standards governing the appropriate DOPT*

The principal dispute in this matter arises from PBGC's selection of June 14, 2002 as the DOPT. Title 29 of the United States Code, § 1348 provides, in pertinent part:

(a) For the purposes of this title the termination date of a single-employer plan is -

(1) in the case of a plan terminated in a standard termination in accordance with the provisions of section 4041(b) [29 USCS § 1341(b)], the termination date proposed in the notice provided under section 4041(b) [29 USCS § 1341(b)],

(2) in the case of a plan terminated in a distress termination in accordance with the provisions of section 4041(b) [29 USCS § 1341(c)], the date established by the plan administrator and agreed to by the corporation,

(3) in the case of a plan terminated in accordance with the provisions of section 4042 [29 USCS § 1342], the date established by the corporation and agreed to by the plan administrator, or

(4) in the case of a plan terminated under section 4041(c) or 4042 [29 USCS § 1341(c) or 1342] in any case in which no agreement is reached between the plan administrator and the corporation (or the trustee), the date established by the court.

29 U.S.C. § 1348(a) (bracketed material in original). Where, as in the instant case, the plan administrator and PBGC are unable to agree on a termination date, Section 1348(a)(4) vests the district court with the authority to establish the DOPT.

Section 1348(a)(4) lacks, however, any express standard to guide the Court's analysis. *See Pension Benefit Guaranty Corp. v. Heppenstall Co.*, 633 F.2d 293, 297 (3d Cir.1980) ("Nowhere in the statute ... is there any explicit standard for the court's guidance in selecting a date. Moreover, the parties have not called to our attention any legislative history suggesting specific congressional attention to that problem."). Addressing this lack of statutory guidance, the first court called

upon to select a termination date construed the statute as requiring it to apply the "statutory standard in section 1342(c)." *Heppenstall*, 633 F.2d at 300. The *Heppenstall* court therefore concluded that the termination date should be selected "in order to protect the interests of the participants and to avoid any further deterioration of the financial condition of the plan or any unreasonable increase in the liability of the fund." *See Heppenstall*, 633 F.2d at 301–02 (discussing 29 U.S.C. § 1342(c)).

In applying the standard, the *Heppenstall* court proposed a three-part analysis: "first, identify the interests of all of the plan participants and the PBGC, second, establish the parameters which maximize those respective interests, and third, within the limits of the statute set the termination date accordingly." *United Steel Workers of Am. v. Harris & Sons Steel Co.*, 706 F.2d 1289, 1298 (3d Cir.1983) (explaining in detail the *Heppenstall* court's analysis as well as the rationales underlying the analysis) (citation and internal quotations omitted).

Subsequent courts have expounded on the *Heppenstall* approach. In *Pension Benefit Guaranty Corp. v. Broadway Maint. Co.*, 707 F.2d 647 (2d Cir.1983), the court opined that "[a]s in *Heppenstall* ... this case should begin by determining the earliest date when the Plan's participants had actual or constructive notice, *i.e.*, notice sufficient to extinguish their reliance interest ... Once that date is ascertained, the District Court should then select whatever later date serves the interests of PBGC." *Broadway Maint.*, 707 F.2d at 652–53. The United States Court of Appeals for the Fourth Circuit summarized *Broadway Maintenance Corp.* as follows:

Instead of merely balancing the employee's reliance interests and PBGC's financial interests in the overall insurance fund, the *Broadway Maintenance* court

established a two[ ]step test: (1) select the earliest date on which participants had notice of termination[;] and (2) "then select whatever later date serves the interests of PBGC." This test is based on two assumptions: (1) that the reliance interests of the participants will never be diminished by the selection of a postnotice date[;] and (2) that the date selected by PBGC adequately protects PBGC's interests.

*Pension Benefit Guaranty Corp. v. Mize Co.*, 987 F.2d 1059, 1063 (4th Cir.1993) (internal citation omitted).

### The parties' proposed DOPTs

In the instant matter, PBGC asserts that an application of the foregoing *Broadway Maintenance* test compels the Court's selection of June 14, 2002 as the DOPT. *See* (Pl.'s Mem. in Supp. at 22–30); (Dkt. # 60, Mem. of the Pension Benefit Guaranty Corp. in Opp'n to Mot. of United Steelworkers of America for Partial Summ. J. Establishing the Date of Plan Termination ("Pl.'s Opp'n") at 2–23). Specifically, PBGC asserts that it effected "widespread publication" of the NODs on June 14, 2002, thereby providing reasonable notice to the participants that their pension benefits, including shutdown benefits, would cease to accrue after that date. *See* (Pl.'s Mem. in Supp. at 26). PBGC further asserts that a termination date of June 14, 2002 protects its financial interests in that such a date prevents the vesting of an additional unfunded liability of approximately $96 million in shut-down benefits. *See* (Pl.'s Mem. in Supp. at 29).

The Union counters that PBGC's "draconian application of the notice requirement cannot be reconciled with the purposes of ERISA, which put promotion of the establishment and maintenance of pension plans for the benefit of participants and the uninterrupted payment of participants' benefits, before any consideration of PBGC's financial interests." (Dkt. # 56, Mem. in Support of United Steelworkers of America's Motion for Partial Summ. J. Establishing the Date of Plan Termination ("Union's Mem. in Support") at 17.) Accordingly, the Union proposes a DOPT on or subsequent to August 17, 2002 in order to extend the PBGC's guaranty to the shut-down benefits provided in the RESI Plan and Union Plan..

### The Court's standards

As a threshold issue, the Court readily adopts the unassailable statutory construction advanced by *Heppenstall* and its progeny that compels the Court to utilize the factors presented in 29 U.S.C. § 1342(c) as the foundation of its DOPT inquiry. The Court further adopts the well-reasoned three-part analysis set forth in *Heppenstall* as the means to protect the interests of the participants and PBGC as required by 29 U.S.C. § 1342(c).

Additionally, the Court concurs in the foregoing authorities' characterization of the interests of the participants and PBGC relevant to the DOPT analysis. It is axiomatic that the participants' interests arise from their continued expectation and reliance on the accrual of vested pension benefits. *See Mize*, 987 F.2d at 1064 ("If extinguishing the employees' reliance interest is all that it takes to set a termination date, there would appear to be little or no incentive to follow the notice procedures in [section] 1342"); *Heppenstall*, 633 F.2d at 301 (determining that a participants' interest in vested pension benefits was an "expectation or reliance interest" and that no participant had a "justifiable expectation in a termination date later than May 31, 1979 when the employer ceased all operations."). On the other hand, "PBGC's interest as a self-financing mutual insurer is to protect its fund and other plans that pay into the fund in the form of termination premiums." *Mize*, 987 F.2d at 1062. *Accord Pension Comm. For*

*Farmstead Foods Pension Plan for Albert Lea Hourly Employees v. Pension Benefit Guaranty Corp.,* 991 F.2d 1415, 1419 (8th Cir.1993) ("The PBGC's liability is based on benefits an employee accrues during the viability of the pension plan. The longer a doomed plan exists, the more benefits qualified participants acquire, and, additional employees may become eligible for benefits."); *Heppenstall,* 633 F.2d at 297 (explaining the various ways in which PBGC's exposure depends on the termination date).

The facts of the instant case compel the Court to proceed cautiously before extending the *Heppenstall* analysis to the simplified two-part criteria espoused by *Broadway Maintenance* and *Mize.* Each of the foregoing authorities confronted scenarios where the participants' interests were in traditional pension benefits (i.e. where vesting was contingent on a combination of age and time of service at the time of retirement). The underlying rationale of these decisions is that the participants' reliance interests extinguished when they received notice that PBGC intended to terminate the defined benefit plans. Simply, the courts equated PBGC's notice of termination with the panoply of other factors (i.e. the participant's discharge prior to vesting, the participant's death prior to vesting, etc.) that a participant could have reasonably expected to terminate his / her accrual of pension benefits.

There is little dispute that the two-part *Broadway Maintenance* criteria adequately serves the interests of the participants and PBGC in the traditional benefits setting. However, the benefits giving rise to the instant dispute over the DOPTthe shut-down benefits provided in the RESI Plan and Union Plan—pose several difficulties that render the two-part test inadequate to an analysis of those plans.

The first difficulty arises from the RESI Plan and Union Plan participants' heightened reliance on shut-down benefits. Shut-down benefits share a timing element with traditional pension benefits; however, they are contingent on the shut-down of participant's place of employment. Unlike other benefits subject to contingent events (i.e. physical disability benefits), shut-down benefits are inextricably intertwined to the financial well-being of the employer. This contingency is of acute significance in the involuntary termination setting because the factor most likely to give rise to the vesting of shut-down benefits—the financial collapse of the employer—is invariably the event that will give rise to an involuntary termination of the participants' defined benefit plan. *See* (Pl.'s Mem. in Supp., Ex. # 1 attached thereto ("2001 Annual Report") at 9 (stating that "[i]n most cases termination was necessary because the sponsoring employer had gone out of business")). Therefore, participants that have fulfilled the timing component of shut-down benefits (i.e. those participants having the requisite combination of age and years of continuous service under the Rule of 65 or 70/80 plans) may reasonably rely that their benefits will vest, even in the event of a plan termination, because it is highly likely that the termination will arise from the employer's cessation of operations.

The Court need not rely, however, exclusively on the general nature of shut-down benefits and the common cause of involuntary terminations to demonstrate the strong reliance interests that the RESI Plan and Union Plan participants maintain in shut-down benefits. The facts demonstrate that the participants, through their collective-bargaining representative, negotiated in 1998 and 1999 to continue the shut-down benefits provided in the Union Plan and to extend such benefits to participants of the RESI Plan. Following RTI's initiation of Chapter 11 proceedings in April, 2001, the Union and RTI negotiated

the MLA that provided if RTI did not satisfy the restructuring conditions on or before May 31, 2002, all parties agreed that RTI would begin to liquidate its assets. When RTI did not satisfy the restructuring conditions by May 31, 2002, the Union entered into the Shut-down Agreement with RTI in an effort to ensure the vesting of shut-down benefits. At that time, those participants that had satisfied the timing component of "70/80" or "Rule of 65" shut-down benefits had a reasonable expectation as to the vesting of those shut-down benefits—subject only to the Bankruptcy Court's approval of the sale to Newco. The relative strength of this reliance interest greatly exceeds the interests in the traditional pension benefits present in *Broadway Maintenance* and *Mize.* Consequently, PBGC's issuance of the NODs did not presumptively terminate the participants' reliance interests in the shut-down benefits.

The Court does not suggest, however, that the participants' interests in shut-down benefits preclude PBGC from proposing a DOPT that prevents such benefits from vesting. The Court determines only that the unique nature of shut-down benefits, coupled with the facts presented herein, require the Court to weigh the relative strength of the interests in shut-down benefits in proportion to the interests of PBGC—rather than to defer to the date PBGC issued the NODs.

The Court next turns to the level of deference that it must afford to PBGC's stated interests. The *Heppenstall* court cautioned against deferring to PBGC's proposed DOPT:

[T]he statutory scheme relegates resolution of disputes over termination to the court in the first instance, not to PBGC. As an insurer in what is essentially a mutual insurance company [PBGC's] ob-

vious interest is to protect the fund and premium payors. Congress determined that in the absence of agreement between PBGC and a plan administrator the court would protect participants from overly cautious use of the involuntary termination of the insurance scheme.

*Heppenstall,* 633 F.2d at 301. Nevertheless, as the agency entrusted to administer involuntary plan terminations, the Court must afford some level deference to PBGC's assessment of its best interests. *See Mize,* 987 F.2d at 1063 ("PBGC's interests should be deemed to be best served by the date proposed by PBGC.").

General principles of administrative law require the Court to afford PBGC's proposed DOPT a "fair measure of deference" limited by "the persuasiveness of the agency's position." [12] *See United States v. Mead Corp.,* 533 U.S. 218, 228, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). Accordingly, the Court must examine the administrative record in an effort to evaluate PBGC's decision.

An examination of the administrative record supporting PBGC's selection of the DOPT reveals several problematic omissions with regard to the RESI Plan and Union Plan. It is undisputed that PBGC stands to incur an additional $96 million in unfunded guaranteed benefits in the event that it is required to guarantee the shut-down benefits. *See* (A.R.17). It is beyond peradventure that the assumption of this level of unfunded liability shut-down benefits will increase the liability of the PBGC insurance fund. However, 29 U.S.C. § 1342(c) provides that the interest of PBGC in termination proceedings is to protect the insurance fund from "any *unreasonable* increase." 29 U.S.C. § 1342(c) (emphasis added). While the statute does

---

12. PBGC similarly proposes that the Court must accord "considerable deference" to its proposed DOPT. *See* (Pl's. Mem. in Opp'n at 22–23).

not define what constitutes an "unreasonable" increase, other provisions of PBGC's enabling act provide guidance. For instance, 29 U.S.C. § 1302(a)(3) charges PBGC with the duty "to maintain premiums established by the corporation under section 1306 of this title at the lowest level consistent with carrying out its obligations under this subchapter." 29 U.S.C. § 1302(a)(3).

An examination of the approximately 3,000–pages of the administrative record reveals a lack of any consideration by the PBGC regarding the effect of the RESI Plan and Union Plan terminations on premiums. Similarly, there is a paucity of evidence in the record regarding the impact of the terminations on the overall stability of the PBGC insurance fund. These omissions are of particular import because at the time PBGC rendered the termination decisions, its most recent annual report declared a surplus of approximately $ 7.7 billion. *See* (2001 Annual Report at 4). Consequently, the lack of any consideration in the record regarding the potential impact of extending PBGC's guaranty to the shut-down benefits precludes the Court from affording the PBGC's a fair amount of deference.

PBGC attempts to overcome the deficiencies in record by demonstrating that its 2002 Annual Report reflects a deficit of approximately $3.6 billion. *See* (2002 Annual Report at 6). While the Court acknowledges the significant liability assumed by PBGC in the year 2002, PBGC's efforts emphasize the precise reason as to why the record must be complete in order to obtain deference from the Court. Simply, any foray by the Court into PGBC's rationales for attempting to prevent the vesting of the shut-down benefits in relation to overall impact on the fund is an exercise in speculation.

■ In light of the deficiencies in the record, the Court finds that PBGC has failed to demonstrate that a DOPT of June 14, 2002 adequately protects the PBGC insurance fund from an unreasonable increase in liability. In contrast, the significant reliance interests of the RESI Plan and Union Plan participants in shut-down benefits compel the Court's selection of a DOPT of August 17, 2002.

Furthermore, the Court concludes that the participants in the Salaried Plan and B & L Plan maintained reliance interests comparable to the participants in *Broadway Maintenance* and *Mize*. Accordingly, the date PBGC issued the NODs regarding the termination of those plans—June 14, 2002—is the appropriate DOPT.

## IV. CONCLUSION

Accordingly, the Court hereby orders: (1) the Motion of the United Steelworkers of America for Partial Summary Judgment Establishing the Date of Plan Termination (Dkt.# 52) is **GRANTED IN PART and DENIED IN PART**; (2) the Motion of Pension Benefit Guaranty Corporation for Summary Judgment (Dkt.# 54) is **GRANTED IN PART and DENIED IN PART**; and (3) Republic Technologies International, LLC's Motion for Interim Appointment of Trustee (Dkt.# 64) is **DENIED AS MOOT**.

**IT IS SO ORDERED.**

### JUDGMENT

This matter is before the Court upon the following three motions: (1) the Motion of the United Steelworkers of America for Partial Summary Judgment Establishing the Date of Plan Termination (Dkt.# 52); (2) the Motion of Pension Benefit Guaranty Corporation for Summary Judgment (Dkt.# 54); and (3) Republic Technologies International, LLC's Motion for Interim Appointment of Trustee (Dkt.# 64).

For the reasons set forth in the Memorandum Opinion and Order issued contem-

poraneously herewith, and incorporated herein by reference, it is the **JUDGMENT** of the Court that the following Plans are **TERMINATED** pursuant to 29 U.S.C. § 1342(c): (1) the RESI Plan; (2) the Union Plan; (3) the Salaried Plan; and (4) the B & L Plan. Additionally, it is the **JUDGMENT** of the Court that PBGC is **APPOINTED** statutory trustee pursuant to 29 U.S.C. § 1342(c), (d), and shall have all powers afforded to the trustee afforded by ERISA with respect to the following plans: (1) the RESI Plan; (2) the Union Plan; (3) the Salaried Plan; and (4) the B & L Plan. Finally, it is the **JUDGMENT** of the Court that the date of plan termination for the RESI Plan and the Union Plan shall be August 17, 2002; and the date of plan termination for the Salaried Plan and B & L Plan shall be June 14, 2002.

**IT IS SO ORDERED.**